400 F.2d 1
 1 Empl. Prac. Dec. P 9973
 MONTGOMERY COUNTY BOARD OF EDUCATION et al., Appellants,
v.
Arlam CARR, Jr., a minor, by Arlam Carr, and Johnnie Carr,
his parents and next friends, et al., Appellees.
UNITED STATES of America, Appellant,
v.
MONTGOMERY COUNTY BOARD OF EDUCATION et al., Appellees.
 No. 25865.
 United States Court of Appeals Fifth Circuit.
 Aug. 1, 1968, Rehearing Denied En Banc Nov. 1, 1968, See 402
F.2d 782.
 
 V. H. Robison, Joseph Phelps, Montgomery, Ala., for appellants.
 Frank D. Allen, J., Nathan Lewin, Atty., Dept. of Justice, Washington, D.C., Fred D. Gray, Montgomery, Alabama, Charles Jones, Jr., New York City, for appellees.
 Before GEWIN and THORNBERRY, Circuit Judges, and ELLIOTT, District judge.
 GEWIN, Circuit Judge:
 
 
 1
 The United States and appellees filed motions in the United States District Court for the Middle District of Alabama on August 17, 1967, and February 7, 1968, requesting the district court to require appellants to take further steps to eliminate the dual school system in Montgomery County, Alabama. Hearings were held on September 5, 1967 and February 9, 1968. The district court entered its order on February 24, 1968, amended March 2, 1968, granting specific relief in the areas of faculty desegregation, student teacher and substitute teacher desegregation, school construction, student transportation, and student choices regarding newly constructed schools. This appeal followed. We affirm the order of the district court as hereinafter modified.
 
 
 2
 We see no need to recite the history of the school board's efforts to comply with the constitutional mandate to desegregate its public schools. However, we note that progress has been made and that the school board has been complimented on its good faith efforts. We do not wish unduly to emphasize or de-emphasize good faith on the part of this particular board of education, but we do take note of the fact that this is the very first time it has been before this court. This case does not bear the 'many service stripes' mentioned in United States v. Board of Education of Bessemer, 5 Cir. 1968, 396 F.2d 44. See also Davis v. Board of School Commissioners of Mobile County, 393 F.2d 690 (5 Cir. 1968).[1] In our view, good faith conduct on the part of any litigant in any court, especially a court of equity and, more particularly, in the sensitive area of desegregation, is a vital element for appropriate consideration. Our feeling with respect to good faith is buttressed by the recent decision of the Supreme Court in Green v. County School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).[2] Some five times, during the period from 1964 to 1967, the district court publicly complimented the Montgomery County School Board on its efforts toward achieving desegregation.[3]
 
 
 3
 It is not necessary to discuss all of the provisions of the district court's order. Appellants challenge that portion of the order which directs them (1) to assign and transfer faculty members, student teachers, and substitute teachers throughout all schools in the system and from one school to another according to a fixed mathematical ratio based on race, and (2) to give affirmative preference to Negro students who choose to attend a newly constructed high school. That part of the court's order challenged on appeal is set forth below:
 
 I. FACULTY AND STAFF
 
 4
 A. Statement of Objective.
 
 
 5
 In achieving the objective of the school system, that the pattern of teacher assignments to any particular school shall not be identifiable as tailored for a heavy concentration of either Negro or white pupils in the school, the school board will be guided by the ratio of Negro to white faculty members in the school system as a whole.
 
 
 6
 The school board will accomplish faculty desegregation by hiring and assigning faculty members so that in each school the ratio of white to Negro faculty members is substantially the same as it is throughout the system. At present, the ratio is approximately 3 to 2. This will be accomplished in accordance with the schedule set out below.
 
 
 7
 B. Schedule for Faculty Desegregation.
 
 
 8
 1. 1968-69. At every school with fewer than 12 teachers, the board will have at least one full-time teacher whose race is different from the race of the majority of the faculty and staff members at the school.
 
 
 9
 At every school with 12 or more teachers, the race of at least one of every six faculty and staff members will be different from the race of the majority of the faculty and staff members at the school. This Court will reserve, for the time being, other specific faculty and staff desegregation requirements for future years.
 
 
 10
 C. Means of Accomplishment.
 
 
 11
 If the school board is unable to achieve faculty desegregation by inducing voluntary transfers or by filling vacancies, then it will do so by the assignment and transfer of teachers from one school to another.
 
 
 12
 D. Substitute Teachers.
 
 
 13
 Commencing in September, 1968, with the 1968-69 school year, the ratio of the number of days taught by white substitute teachers to the number of days taught by Negro substitute teachers at each school during each semester will be substantially the same as the ratio of white substitute teachers to Negro substitute teachers on the list of substitute teachers at the beginning of the semester.
 
 
 14
 Commencing with the 1968-69 school year, the board will not use an individual as a substitute teacher in the Montgomery Public Schools if he will consent to substitute only at predominantly white schools or only at predominantly Negro schools.
 
 
 15
 E. Student Teachers.
 
 
 16
 Commencing in September, 1968, with the 1968-69 school year, the ratio of white to Negro student teachers each semester in each school that uses student teachers will be substantially the same as the ratio of white and Negro student teachers throughout the system.
 
 
 17
 F. Night Schools.
 
 
 18
 Commencing June 1, 1968, the ratio of white to Negro faculty members at each night school will be substantially the same as the ratio of white to Negro faculty members throughout the night-school program.
 
 
 19
 IV. JEFFERSON DAVIS HIGH SCHOOL, PETER CRUMP SCHOOL, AND SOUTHLAWN SCHOOL
 
 
 20
 D. Honoring Choices.
 
 
 21
 The school board will honor the choices of each Negro student who chooses to attend Jefferson Davis High School during the 1968-69 school year, in the absence of compelling circumstances approved by the Court on the school board's motion.
 
 
 22
 The district court denied appellees' request that the ratio of white to Negro faculty members in new schools be approximately three to two in their first year of operation. Appellees have cross-appealed on this issue.
 
 
 23
 * ASSIGNMENT OF TEACHERS
 
 
 24
 It is clear from the record and briefs that appellants fully recognize that they have the affirmative duty to desegregate the faculties throughout their entire school system. They have been striving to carry out this duty by seeking and encouraging voluntary transfers of teachers and by requesting new teachers to accept positions in schools where their race is in the minority. Appellants further recognize that they have the legal right to compel faculty assignment if voluntary placement is not effective.[4] However, appellants object to the district court's order requiring assignment of teachers on the ground that such is not in keeping with sound and quality school administration. We quote from appellants' brief:
 
 
 25
 In Beckett v. School Board of City of Norfolk, Virginia, 269 F.Supp. 118 at page 139 (E.D.Va. May, 1967) the Court stated, in considering faculty desegregation:
 
 
 26
 However, in line with the most recent Wheeler case (Wheeler v. Durham City Board of Education, 4 Cir., 363 F.2d 738), the School Board has not adopted the tactic of compelling a teacher to transfer. Moreover, such a practice would not be in accord with sound educational principles.
 
 
 27
 The question of whether a school board is obligated to assign teachers to schools where their race is in the minority when efforts to persuade teachers voluntarily to accept such positions fail, has recently been before this court. United States v. Board of Educ. of Bessemer, supra. That opinion answers the above question with an emphatic yes. We quote:
 
 
 28
 The School Boards do not meet their duty by soliciting volunteers. For the fact remains that the 'responsibility for faculty desegregation, just as the responsibility of student desegregation, lies ultimately with the board, not the teachers.' Davis v. Board of School Commissioners of Mobile County, 5 Cir. 1968, 393 F.2d 690. So there will be no mistake about it we spell out that Jefferson stands for the proposition that there is an affirmative duty on the part of the School Boards to do everything-- the word is everything-- within their power to meet the decree-imposed complete desegregation of faculties. It is not, it cannot be, left to the voluntariness of teacher applicants or transfers.
 
 
 29
 We therefore find no error in the court's order requiring the assignment of teachers since efforts to achieve faculty desegregation by voluntary means have failed.
 
 II
 FIXED MATHEMATICAL RATIO
 
 30
 Appellants strenuously object to the imposition of the mathematical ratios contained in the district court's order. They contend that such ratios are arbitrary and unwarranted in view of their extensive plans to desegregate their faculties, their showing of good faith, and the overall achievment of progress in the area. In addition, appellants submit that a fixed ratio does not take into consideration the availability of teaching personnel or the complexity of school administration, and that it ignores the goal of quality education and other similar factors which are inevitably involved in the operation of a school system.
 
 
 31
 After extensive hearings, the court below found that desegregation of faculties in the Montgomery County school system was lagging and that appellants had failed to comply with earlier orders of the court requiring full faculty desegregation. In order to remedy the lack of faculty integration, the court imposed specific targets for the school year 1968-69 and, more specifically, delineated what would be required for satisfactory compliance. Thus, under the district court's order for the school year 1968-69, most schools in Montgomery County must have rougly one-sixth of the faculty and staff of a race different from that of the other five-sixths. The school board will have achieved full compliance when the ratio of white to Negro teachers is three to two in each school. At the outset we note that the testimony of school officials indicates a need for specific directives in the instant case.[5]
 
 
 32
 In United States v. Jefferson County Board of Education, 372 F.2d 836 (5 Cir. 1966), aff'd en banc, 380 F.2d 385 (5 Cir. 1967), cert. denied, 389 U.S. 840, 88 S.Ct. 77, 19 L.Ed.2d 104 (1967), we dealt with faculty desegregation. Following Jefferson the question of faculty desegregation has recently been before this court on at least three separate occasions. Stell v. Board of Public Education for City of Savannah, 387 F.2d 486 (5 Cir. 1967); Davis v. Board of School Commissioners of Mobile County, supra; and United States v. Board of Education of Bessemer,supra. We have continued to emphasize the responsibility of school boards in achieving effective faculty desegregation. We have emphasized the desirability of their doing so because of their expertise in the field of education. Nevertheless, we have made it clear that it is the duty of district courts to require specific target dates and accomplishments in order to ensure full compliance with all deliberate speed. Moreover, it is clear from recent decisions of the Supreme Court that the type of plan under which school boards should operate is a plan which works. Green v. County School Board of New Kent County, supra; Monroe v. Board of Commissioners of City of Jackson, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968); Raney v. Board of Education of Gould, 391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727 (1968).[6]
 
 
 33
 Immediately following the Brown decisions,[7] emphasis was placed on the desegregation of schools from the point of view of the students. Faculty and staff desegregation are more recent. While it is obvious that we cannot tolerate the delay which has been experienced with respect to the desegregation of students, the decisions, in dealing with faculty and staff, have indicated 'the likelihood of some lessons to be learned from experimentation.'[8] In the case sub judice, the district court concluded that Montgomery County had not fully complied with its orders to effectuate desegregation of faculty, that the plan under which the school board had sought to integrate the faculty was not adequate, and, therefore, that another more specific plan was necessary.
 
 
 34
 It is our conclusion that the standards fixed by courts with respect to faculty desegregation cannot be totally inflexible. In none of the three recent cases cited above, Stell, Davis, and Bessemer, has this court required faculty integration according to a numerical or racial percentage ratio. On the contrary, we have declined 'to enhance Jefferson's demands.'[9] We do not intimate that there must always be a slavish and unswerving adherence to the precise requirements of Jefferson, but generally we have avidly embraced the idea of circuit-wide uniformity and have declined 'to tinker with the model decree.'[10] As a matter of fact, after the decision of the district court in this case, we have actually rejected the idea of requiring mathematical or racial percentage ratios in dealing with faculty and staff. We quote from the Bessemer decision:
 
 
 35
 We are requested to do both too much and too little. The school boards with a sincerity of counsel we do not question, urge us, in effect, to do nothing specific either in terms of target dates or racial percentage ratios, or both. The government, on the other hand, proposes that we direct the entry of a proposed sweeping, detailed decree which it frankly acknowledges adds to and extends Jefferson. We think neither alternative is wise.
 
 We stated further:
 
 36
 Even though Jefferson was more equivocal on faculty integration and expressed the likelihood of some lessons to be learned from experimentation, we think we should apply an even hand to deny requests to enhance Jefferson's demands.
 
 
 37
 The decree under review states that schools with twelve or more faculty members must begin the school year 1968-69 with at least one of every six faculty and staff members being of a different race from the majority. Because of the difficulties inherent in achieving a precise five-to-one ratio, this part of the district court's order should be interpreted to mean substantially or approximately five to one. The decree is modified to this extent in order to allow a degree of flexibility in the application of the 1968-69 interim requirements.
 
 
 38
 Additionally, whether the school board is in full compliance should not be decided solely by whether it has achieved the requisite numerical ratios.[11] The assignment of faculty and other staff to particular schools need not mirror the total faculty of the entire system as related to race or color. There must be a good faith and effective beginning and a good faith and effective effort to achieve faculty and staff desegregation for the entire system. Although a ratio of substantially or approximately five to one is a good beginning, we cannot say that a ratio of substantially three to two, simply because it mirrors the racial balance of the entire faculty, must be achieved as a final objective.[12] Consideration must be given to the availability of teaching personnel, sound school administrative procedure, and other important factors. Consequently, under the facts and in the circumstances of this case, the order will be modified accordingly, and the numerical ratios set forth in the district court's order and decree will be eliminated. This modification does not affect the five-to-one interim ratio for the school year 1968-69 as hereinabove modified.
 
 
 39
 Nothing we say in this opinion shall be construed to mean that we authorize, permit, approve or condone the consideration of race or color as a factor in the employment, assignment, reassignment, promotion, demotion or dismissal of full-time teachers, substitute teachers, student teachers or other professional staff members except to the extent that the same may be taken into account for the purpose of counteracting or correcting the effects of racial segregation in any dual school system. Any conduct by any school board which is based on racial discrimination is unauthorized, disapproved and will not be tolerated. It is hoped and believed that experience will teach effective ways and means of achieving an ideal racial balance. School boards must not use excuses to delay the achievement of full faculty and staff desegregation. They have the responsibility and should exercise the ingenuity to achieve a proper racial balance. We have repeatedly asserted that school boards are better equipped to achieve these aims than are the courts; but, if they fail or refuse to act, they should now fully realize that the courts will require action.
 
 III
 JEFFERSON DAVIS HIGH SCHOOL
 
 40
 From the evidence presented the district court found that the newly constructed Jefferson Davis High School, scheduled to commence operations by the 1968 school year, further perpetuated the dual school system. More specifically, the court found that the location of the school in a substantially all-white neighborhood, the enrollment capacity of the school, the publicity surrounding the recruitment of white personnel, and the scheduling of athletic events established the new high school, from its very inception, as a 'white' school. Indeed, the court found that the conduct of the school board relating to the new high school was 'most aggravating.' In order to combat the actions of school authorities and to eradicate the impression that the new air-conditioned Jefferson Davis High School was to be an exclusively white school, the district court decreed that the school board will honor the choice of each Negro student who chooses to attend Jefferson High during the 1968-69 school year.
 
 
 41
 Appellants contend that requiring affirmative racial preference to be given to Negro students for attendance in the Jefferson Davis High School is unwarranted. They submit that the school board did not plan the new high school exclusively for white children. They state in their brief that the school board's current plans call for the employment of seven Negro teachers in the school. Further, they point to the fact that the school will open on a 'freedom of choice' basis. To date 150 Negro students have chosen to attend the high school which has a capacity of 967 students. Appellants state to the court in their brief that these Negro choices will be honored in accordance with the provisions of the school board's plan.
 
 
 42
 We have examined the record and conclude that the findings of the district court that various actions on the part of appellants created the impression that the Jefferson Davis High School was intended to serve a predominantly white student body is supported by some evidence. We conclude that the district court's decree was designed to overcome the impact of the school board's discriminatory conduct as found to exist by the court. The decree requires the school board to honor the choice of each Negro student 'in the absence of compelling circumstances approved by the court on the School Board's motion.' We cannot be certain as to the court's intended meaning of the term 'compelling circumstances.' We interpret the term to embrace those reasons which are inherent in and are supported by proper standards of sound school administrative procedure, giving due consideration to all factors and circumstances which are proper to be considered in passing upon such choices.
 
 IV
 FACULTY RATIOS IN NEWLY CONSTRUCTED SCHOOLS
 
 43
 Appellees contend that the district court committed error in not requiring immediate compliance with the three-to-two ratio in schools which will commence operation in 1968. They submit that there would be fewer administrative problems if complete faculty desegregation were achieved at the inception of a new school. However, in the court's order of March 2, 1968, it spoke approvingly of permitting the school board to achieve the ultimate objective of a completely desegregrated school system gradually. The court stated that gradualism had been found to work quite successfully in the past and that gradualism was contemplated by the court in accomplishing the ultimate objective. We cannot say that the court's decision to refrain from requiring full faculty integration in new schools is erroneous.
 
 
 44
 The order of the district court is affirmed as herein modified. The Clerk is directed to issue the mandate forthwith.
 
 
 45
 Affirmed as modified.
 
 
 46
 THORNBERRY, Circuit Judge, concurs except as to the modifications of numerical ratios and reserves the right to dissent as to such modifications at a later date.
 
 
 
 [1]
 In Davis, the court mentioned the fact that the case involving Mobile schools had been before the Fifth Circuit five times since 1963. 393 F.2d at 691 n. 1
 
 
 [2]
 There is no universal answer to complex problems of desegregation; there is obviously no one plan that will do the job in every case. The matter must be assessed in light of the circumstances present and the options available in each instance. It is incumbent upon the school board to establish that its proposed plan promises meaningful and immediate progress toward disestablishing state-imposed segregation. It is incumbent upon the district court to weigh that claim in light of the facts at hand and in light of any alternatives which may be shown as feasible and more promising in their effectiveness. Where the court finds the board to be acting in good faith and the proposed plan to have real prospects for dismantling the state-imposed dual system 'at the earliest practicable date,' then the plan may be said to provide effective relief. Of course, where other, more promising courses of action are open to the board, that may indicate a lack of good faith; and at the least it places a heavy burden upon the board to explain its preference for an apparently less effective method. 391 U.S. at 439, 88 S.Ct. at 1695, 20 L.Ed.2d at 724
 
 
 [3]
 At the conclusion of a hearing on May 25, 1967, the court made the following statement from the bench:
 I would like to say this to you here in the presence of the plaintiffs and the Government lawyers; that I am impressed that the Montgomery County Superintendent of Education and members of the Montgomery County School Board of Education now evidence and have in the past evidenced a desire and intent to operate a school system here in Montgomery County as professional educators and not as politicians. This present attitude is demonstrated here at this time; this past conduct on the part of these officials has, without any doubt, inured to the benefit of the students regardless of their race, in Montgomery County that seek quality education. And I have observed and I have been impressed that these officials have accomplished this largely through-- or this has been accomplished largely through their efforts and without any serious discord or disruption as far as any school is concerned. This, when it is compared with some other similar operations is a considerable feat, for which this community, in my judgment, owes these school officials their appreciation. It evidences a pattern of professional conduct that other systems could, for the benefit of their students, emulate.
 Again on September 5, 1967, at the conclusion of a hearing which apparently formed a partial basis for the order now under consideration, the court stated from the bench:
 You are dealing here with a school system that you haven't had to take to your appellate courts a single time since you started. It is the only major school system in the State that you haven't had to do it on; that they have done what they have done in good faith, and they had been ahead of most of your other systems in every field.
 
 
 [4]
 Although appellants consistently argue for voluntary assignment of teachers and staff and contend that 'sound and quality school administration' favors voluntary assignment, the following statement from appellants' brief shows clearly that they recognize their obligation:
 These appellants fully recognize that they have the affirmative duty to desegregate the faculty throughout this school system to the end that 'the pattern of teacher assignment to any particular school shall not be identified as tailored for a heavy concentration of either Negro or white pupils in the schools.' (R. p. 370 and U.S. v. Jefferson County Board of Education, (5 Cir.), 372 F.2d 836; aff'd en banc, 380 F.2d 385) The appellant recognizes further that they have the legal right to compel faculty assignment if voluntary placement is not effective.
 
 
 [5]
 The following is an excerpt of the testimony of Associate Superintendent W. S. Garrett:
 Q. As part of your duties, have you been given the responsibility, primarily, of carrying out faculty desegregation? A. Well, the superintendent has delegated the recommending of the best faculty members that I can come by, and desegregation is a large-- our faculty is a large part of my responsibilities; not the only one, but that has been discussed and-- with the Board and with the superintendent, and we have a plan to accomplish this, have been working on it all year. Q. Well, under your plan, when do you estimate that faculty desegregation will be finally accomplished in terms of the objective of the court order removing-- A. Well, now, that is something I don't know, because I don't know what the objectives of the court order are. That has never been laid down in any percentage fashion that I know of. It says that you will have reasonable desegregation of faculty and that you will strive toward having each faculty not recognizable as being staffed for a particular race. That is what I get our of it. Q. Well, let-- A. So I-- I can't-- this court order is in fairly general terms; I can't answer that question. Q. Well, you made the statement about having schools staffed so that they will not be recognizable as for a particular race; when do you expect that that will be accomplished? A. Well, that would depend on what the Board's definition of that is, the court's definition of that. Q. Do you have a definition of that? A. Not at this point; we have discussed that many times, and I do not have a definition of-- of what that would mean. Q. No one has told you, given you a definition in terms of mechanics, in terms of numbers, none of your superiors? A. No, as far as I know, no other school personnel man in America has. I have talked to many of them. What we are striving to do is to make progress and keep going and hope that somewhere along the line we will have achieved the-- what the court has in mind. But if you will look at that court order, you will see it doesn't lay down the precise terms exactly what that means; it is a broad definition.
 
 
 [6]
 In both Green and Monroe faculty integration was an issue before the district courts and the courts of appeals. The Supreme Court made no pronouncement with respect to faculty integration but apparently left that decision to the district courts involved under the remand orders of the Courts of Appeals in the two cases. The following is from the Green decision:
 The Court of Appeals for the Fourth Circuit, en banc, Bowman v. County School Board of Charles City County, Virginia, 382 F.2d 326, 338, affirmed the Dictrict Court's approval of the 'freedom-of-choice' provisions of the plan but remanded the case to the District Court for entry of an order regarding faculty 'which is much more specific and more comprehensive' and which would incorporate in addition to a 'minimal, objective time table' some of the faculty provisions of the decree entered by the Court of Appeals for the Fifth Circuit in United States v. Jefferson County Board of Education, 372 F.2d 836, aff'd en banc, 380 F.2d 385 (1967).
 391 U.S. at 434, 88 S.Ct. at 1692, 20 L.Ed. at 722.
 In Monroe the Supreme Court stated:
 The Court of Appeals for the Sixth Circuit affirmed except on an issue of faculty desegregation, as to which the case was remanded for further proceedings.
 391 U.S. at 456, 88 S.Ct. at 1703, 20 L.Ed.2d at 738.
 In Raney the Court stated: 'Faculties and staff were and are segregated.' 391 U.S. at 445, 88 S.Ct. at 1698, 20 L.Ed.2d at 730. Faculty segregation or integration is not mentioned further in the opinion.
 
 
 [7]
 Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and Brown v. Board of Education of Topeka, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955)
 
 
 [8]
 See United States v. Board of Education of Bessemer, supra; United States v. Jefferson County Board of Education, supra
 
 
 [9]
 See United States v. Board of Education of Bessemer, supra
 
 
 [10]
 As we pointed out in United States v. Board of Education of Bessemer, supra:
 We must steel ourselves against the importunities to import inequality by judicial modifications to meet some supposed need of a locality. One immediate consequence of such a practice would be to encourage others to try their hand. And soon we'd be back in the school business again-- a role for which we are not equipped or competent to handle. The efforts to reduce the demands of Jefferson we've resisted so far. See, e.g., Barnhardt v. Meridian Municipal Separate School Dist., 5 Cir. 1968, 394 F.2d 454; Gaines v. Dougherty County Board of Education, 5 Cir. 1968, 392 F.2d 669; Stell v. Board of Public Education for the City of Savannah, 5 Cir. 1967, 387 F.2d 486.
 
 
 [11]
 Various district courts have entered orders that contain specific standards and at least one appellate court has approved such an order. Coppedge v. Franklin County Board of Education, 273 F.Supp. 289 (E.D.N.C.1967); Kier v. County School Board of Augusta County, 249 F.Supp. 239 (W.D.Va.1966); Board of Education of Oklahoma City Public Schools v. Dowell, 375 F.2d 158 (10 Cir. 1967). Also, though the Eighth Circuit refrained from imposing an exact formula in Kelley v. Altheimer, Arkansas, Public School District No. 22, 378 F.2d 483 (1967), it specifically called the district court's attention to percentage formulas set by other district courts
 
 
 [12]
 After the decision in Kelley v. Altheimer, Arkansas Public School District No. 22, supra note 11, the Eighth Circuit decided the case of Yarbrough v. Hulbert-West Memphis School Dist. No. 4, 380 F.2d 962 (8 Cir. 1967). In Yarbrough that circuit rejected the idea of a mathematical formula and a fixed timetable and placed this interpretation upon its prior decision in Altheimer:
 We say in passing that this panel does not regard Altheimer as imposing any rigid mathematical formula which, in certain situations, could itself be arbitrary and without educational significance. We regard that case as one requiring a reluctant school board to get on with its task of achieving faculty and staff desegregation and assignment to comport with equitable and constitutional requirements divorced from racial considerations. Numbers and percentages per se are not the ultimate answer but, up to a point, they touch upon realities. This, we think, is the significance of Altheimer.