MONROE ET AL. *v.* BOARD OF COMMISSIONERS
OF THE CITY OF JACKSON ET AL.

No. 740.   Argued April 3, 1968.—Decided May 27, 1968.

*James M. Nabrit III* and *Jack Greenberg* argued the cause for petitioners. With them on the brief were *Michael Meltsner, Avon N. Williams, Jr.,* and *Z. Alexander Looby.*

*Russell Rice, Sr.,* argued the cause and filed a brief for respondents.

*Louis F. Claiborne* argued the cause for the United States, as *amicus curiae*. With him on the brief were *Solicitor General Griswold, Assistant Attorney General Pollak, Lawrence G. Wallace,* and *Brian K. Landsberg.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

This case was argued with No. 695, *Green* v. *County School Board of New Kent County, ante,* p. 430, and No. 805, *Raney* v. *Board of Education of the Gould School District, ante,* p. 443. The question for decision is similar to the question decided in those cases. Here, however, the principal feature of a desegregation plan—which calls in question its adequacy to effectuate a transition to a racially nondiscriminatory system in compliance with *Brown* v. *Board of Education,* 349 U. S. 294 (*Brown II*)—is not "freedom of choice" but a variant commonly referred to as "free transfer."

The respondent Board of Commissioners is the School Board for the City of Jackson, located in midwestern Tennessee. The school district coincides with the city limits. Some one-third of the city's population of 40,000 are Negroes, the great majority of whom live in the city's central area. The school system has eight elementary schools, three junior high schools, and two senior high schools. There are 7,650 children enrolled in the system's schools, about 40% of whom, over 3,200, are Negroes.

In 1954 Tennessee by law required racial segregation in its public schools. Accordingly, five elementary schools, two junior high schools, and one senior high school were operated as "white" schools, and three elementary schools, one junior high school, and one senior high school were operated as "Negro" schools. Racial segregation extended to all aspects of school life including faculties and staffs.

After *Brown* v. *Board of Education,* 347 U. S. 483 (*Brown I*), declared such state-imposed dual systems unconstitutional, Tennessee enacted a pupil placement law, Tenn. Code § 49–1741 *et seq.* (1966). That law continued previously enrolled pupils in their assigned schools and vested local school boards with the exclusive authority to approve assignment and transfer requests. No white children enrolled in any "Negro" school under the statute and the respondent Board granted only seven applications of Negro children to enroll in "white" schools, three in 1961 and four in 1962. In March 1962 the Court of Appeals for the Sixth Circuit held that the pupil placement law was inadequate "as a plan to convert a biracial system into a nonracial one." *Northcross* v. *Board of Education of City of Memphis,* 302 F. 2d 818, 821.

In January 1963 petitioners brought this action in the District Court for the Western District of Tennessee. The complaint sought a declaratory judgment that respondent was operating a compulsory racially segregated school system, injunctive relief against the continued maintenance of that system, an order directing the admission to named "white" schools of the plaintiff Negro school children, and an order requiring respondent Board to formulate a desegregation plan. The District Court ordered the Board to enroll the children in the schools in question and directed the Board to formulate and file a desegregation plan. A plan was duly filed and, after modifications directed by the court were incorporated, the plan was approved in August 1963 to be effective immediately in the elementary schools and to be gradually extended over a four-year period to the junior high schools and senior high schools. 221 F. Supp. 968.

The modified plan provides for the automatic assignment of pupils living within attendance zones drawn by the Board or school officials along geographic or "natural"

boundaries and "according to the capacity and facilities of the [school] buildings . . ." within the zones. *Id.,* at 974. However, the plan also has the "free-transfer" provision which was ultimately to bring this case to this Court: Any child, after he has complied with the requirement that he register annually in his assigned school in his attendance zone, may freely transfer to another school of his choice if space is available, zone residents having priority in cases of overcrowding. Students must provide their own transportation; the school system does not operate school buses.

By its terms the "free-transfer" plan was first applied in the elementary schools. After one year of operation petitioners, joined by 27 other Negro school children, moved in September 1964 for further relief in the District Court, alleging respondent had administered the plan in a racially discriminatory manner. At that time, the three Negro elementary schools remained all Negro; and 118 Negro pupils were scattered among four of the five formerly all-white elementary schools. After hearing evidence, the District Court found that in two respects the Board had indeed administered the plan in a discriminatory fashion. First, it had systematically denied Negro children—specifically the 27 intervenors—the right to transfer from their all-Negro zone schools to schools where white students were in the majority, although white students seeking transfers from Negro schools to white schools had been allowed to transfer. The court held this to be a constitutional violation, see *Goss* v. *Board of Education,* 373 U. S. 683, as well as a violation of the terms of the plan itself. 244 F. Supp. 353, 359. Second, the court found that the Board, in drawing the lines of the geographic attendance zones, had gerrymandered three elementary school zones to exclude Negro residential areas from white school zones and to include

those areas in zones of Negro schools located farther away. *Id.,* at 361–362.

In the same 1964 proceeding the Board filed with the court its proposed zones for the three junior high schools, Jackson and Tigrett, the "white" junior high schools, and Merry, the "Negro" junior high school. As of the 1964 school year the three schools retained their racial identities, although Jackson did have one Negro child among its otherwise all-white student body. The faculties and staffs of the respective schools were also segregated. Petitioners objected to the proposed zones on two grounds, arguing first that they were racially gerrymandered because so drawn as to assign Negro children to the "Negro" Merry school and white children to the "white" Jackson and Tigrett schools, and alternatively that the plan was in any event inadequate to reorganize the system on a nonracial basis. Petitioners, through expert witnesses, urged that the Board be required to adopt a "feeder system," a commonly used method of assigning students whereby each junior high school would draw its students from specified elementary schools. The groupings could be made so as to assure racially integrated student bodies in all three junior high schools, with due regard for educational and administrative considerations such as building capacity and proximity of students to the schools.

The District Court held that petitioners had not sustained their allegations that the proposed junior high school attendance zones were gerrymandered, saying

"Tigrett [white] is located in the western section, Merry [Negro] is located in the central section and Jackson [white] is located in the eastern section. The zones proposed by the defendants would, generally, allocate the western section to Tigrett, the central section to Merry, and the eastern section to

Jackson. The boundaries follow major streets or highways and railroads. According to the school population maps, there are a considerable number of Negro pupils in the southern part of the Tigrett zone, a considerable number of white pupils in the middle and northern parts of the Merry zone, and a considerable number of Negro pupils in the southern part of the Jackson zone. The location of the three schools in an approximate east-west line makes it inevitable that the three zones divide the city in three parts from north to south. While it appears that proximity of pupils and natural boundaries are not as important in zoning for junior highs as in zoning for elementary schools, it does not appear that Negro pupils will be discriminated against." 244 F. Supp., at 362.

As for the recommended "feeder system," the District Court concluded simply that "there is no constitutional requirement that this particular system be adopted." *Ibid.* The Court of Appeals for the Sixth Circuit affirmed except on an issue of faculty desegregation, as to which the case was remanded for further proceedings. 380 F. 2d 955. We granted certiorari, 389 U. S. 1033, and set the case for oral argument immediately following *Green* v. *County School Board, supra.* Although the case presented by the petition for certiorari concerns only the junior high schools, the plan in its application to elementary and senior high schools is also necessarily implicated since the right of "free transfer" extends to pupils at all levels.

The principles governing determination of the adequacy of the plan as compliance with the Board's responsibility to effectuate a transition to a racially nondiscriminatory system are those announced today in *Green* v. *County School Board, supra.* Tested by those

principles the plan is clearly inadequate. Three school years have followed the District Court's approval of the attendance zones for the junior high schools. Yet Merry Junior High School was still completely a "Negro" school in the 1967–1968 school year, enrolling some 640 Negro pupils, or over 80% of the system's Negro junior high school students. Not one of the "considerable number of white pupils in the middle and northern parts of the Merry zone" assigned there under the attendance zone aspect of the plan chose to stay at Merry. Every one exercised his option to transfer out of the "Negro" school. The "white" Tigrett school seemingly had the same experience in reverse. Of the "considerable number of Negro pupils in the southern part of the Tigrett zone" mentioned by the District Court, only seven are enrolled in the student body of 819; apparently all other Negro children assigned to Tigrett chose to go elsewhere. Only the "white" Jackson school presents a different picture; there, 349 white children and 135 Negro children compose the student body. How many of the Negro children transferred in from the "white" Tigrett school does not appear. The experience in the junior high schools mirrors that of the elementary schools. Thus the three elementary schools that were operated as Negro schools in 1954 and continued as such until 1963 are still attended only by Negroes. The five "white" schools all have some Negro children enrolled, from as few as three (in a student body of 781) to as many as 160 (in a student body of 682).

This experience with "free transfer" was accurately predicted by the District Court as early as 1963:

"In terms of numbers . . . the ratio of Negro to white pupils is approximately 40–60. This figure is, however, somewhat misleading as a measure of the extent to which integration will actually occur

458

under the proposed plan. Because the homes of Negro children are concentrated in certain areas of the city, a plan of unitary zoning, even if prepared without consideration of race, will result in a concentration of Negro children in the zones of heretofore 'Negro' schools and white children in the zones of heretofore 'white' schools. *Moreover, this tendency of concentration in schools will be further accentuated by the exercise of choice of schools . . . .*" 221 F. Supp., at 971. (Emphasis supplied.)

Plainly, the plan does not meet respondent's "affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." *Green* v. *County School Board, supra,* at 437–438. Only by dismantling the state-imposed dual system can that end be achieved. And manifestly, that end has not been achieved here nor does the plan approved by the lower courts for the junior high schools promise meaningful progress toward doing so. "Rather than further the dismantling of the dual system, the ["free transfer"] plan has operated simply to burden children and their parents with a responsibility which *Brown II* placed squarely on the School Board." *Green* v. *County School Board, supra,* at 441–442. That the Board has chosen to adopt a method achieving minimal disruption of the old pattern is evident from its long delay in making any effort whatsoever to desegregate, and the deliberately discriminatory manner in which the Board administered the plan until checked by the District Court.

The District Court approved the junior high school attendance-zone lines in the view that as drawn they assigned students to the three schools in a way that was capable of producing meaningful desegregation of all three schools. But the "free-transfer" option has

permitted the "considerable number" of white or Negro students in at least two of the zones to return, at the implicit invitation of the Board, to the comfortable security of the old, established discriminatory pattern. Like the transfer provisions held invalid in *Goss* v. *Board of Education,* 373 U. S. 683, 686, "[i]t is readily apparent that the transfer [provision] lends itself to perpetuation of segregation." While we there indicated that "free-transfer" plans under some circumstances might be valid, we explicitly stated that "no official transfer plan or provision of which racial segregation is the inevitable consequence may stand under the Fourteenth Amendment." *Id.,* at 689. So it is here; no attempt has been made to justify the transfer provision as a device designed to meet "legitimate local problems," *ibid.;* rather it patently operates as a device to allow *resegregation* of the races to the extent desegregation would be achieved by geographically drawn zones. Respondent's argument in this Court reveals its purpose. We are frankly told in the Brief that without the transfer option it is apprehended that white students will flee the school system altogether. "But it should go without saying that the vitality of these constitutional principles cannot be allowed to yield simply because of disagreement with them." *Brown II,* at 300.

We do not hold that "free transfer" can have no place in a desegregation plan. But like "freedom of choice," if it cannot be shown that such a plan will further rather than delay conversion to a unitary, nonracial, nondiscriminatory school system, it must be held unacceptable. See *Green* v. *County School Board, supra,* at 439–441.

We conclude, therefore, that the Board "must be required to formulate a new plan and, in light of other courses which appear open to the Board, . . . fashion steps which promise realistically to convert promptly to a

system without a 'white' school and a 'Negro' school, but just schools." *Id.,* at 442.*

The judgment of the Court of Appeals is vacated insofar as it affirmed the District Court's approval of the plan in its application to the junior high schools, and the case is remanded for further proceedings consistent with this opinion and with our opinion in *Green* v. *County School Board, supra.*

*It is so ordered.*

---

*We imply no agreement with the District Court's conclusion that under the proposed attendance zones for junior high schools "it does not appear that Negro pupils will be discriminated against." We note also that on the record as it now stands, it appears that petitioners' recommended "feeder system," the feasibility of which respondent did not challenge in the District Court, is an effective alternative reasonably available to respondent to abolish the dual system in the junior high schools.