**MONTGOMERY COUNTY BOARD OF EDUCATION et al., Appellants,**

v.

**Arlam CARR, Jr., a minor, by Arlam Carr, and Johnnie Carr, his parents and next friends, et al., Appellees.**

**UNITED STATES of America, Appellant,**

v.

**MONTGOMERY COUNTY BOARD OF EDUCATION et al., Appellees.**

**No. 25865.**

United States Court of Appeals Fifth Circuit.

Oct. 21, 1968.

Rehearing En Banc Denied Nov. 1, 1968.

Certiorari Granted March 3, 1969.

See 89 S.Ct. 989.

For original opinion see 5 Cir., 400 F.2d 1.

V. H. Robison, Joseph Phelps, Montgomery, Ala., for appellants.

Frank D. Allen, Jr., Nathan Lewin, Attys., Dept. of Justice, Washington, D. C., Fred D. Gray, Montgomery, Ala., Charles Jones, Jr., New York City, for appellees.

Before GEWIN and THORNBERRY, Circuit Judges, and ELLIOTT, District Judge.

THORNBERRY, Circuit Judge (dissenting):

The imposition of a specific ratio for each school as the ultimate objective of faculty integration is a new step for this Circuit, but it represents the considered judgment of a district judge who was familiar with the Montgomery schools, had heard testimony, and was making an honest effort to advance the conversion to a unitary racially nondiscriminatory system as required by the Constitution. Having found the objections to this part of the decree rather unpersuasive,[1] I would affirm the district court. To the extent that the majority have entered modifications, I respectfully and in all deference dissent.

In *Jefferson County,* this Court stated the importance of faculty integration as forcefully as our language permits:

Yet until school authorities recognize and carry out their affirmative duty to integrate faculties as well as facilities, there is not the slightest possibility of their ever establishing an operative nondiscriminatory school system.

372 F.2d at 892. The general obligations of local boards were articulated, but the formulation of more specific provisions, i. e., provisions that would ultimately get the job done, was left to the boards and district courts:

It is essential that school officials (1) cease practicing racial discrimination in the hiring and assignment of new faculty members and (2) take affirmative programmatic steps to correct existing effects of past racial assignment. *If these two requirements are prescribed, the district court should be able to add specifics to meet the particular situation the case presents.* (Emphasis added.)

372 F.2d at 893. In this case, the district judge saw in the record a lack of progress in the crucial area of faculty integration [2] and a need for specific directions. His solution was to set a three-to-two ratio as the ultimate objective for each school, and I see no basis in the record or the cases for modifying his determination. To be sure, he was experimenting, but I

1. The school board acknowledges that it must desegregate faculty so that no school is identifiable as being tailored for a heavy concentration of Negro or white students, but says that specific ratios are not required by the cases and would be achieved at the cost of quality education. Also, it is predicted that there will be a general exodus of teachers to other parts of the state. The latter point seems to assume that which is not the case, namely, that school boards in other parts of the state are not obligated to integrate the faculty of each school. As I try to show by this dissent, nothing in the cases precludes numerical ratios. Indeed, the cases require district courts to devise specific provisions to implement the general requirements of *Jefferson.*

The final argument that quality education will be sacrificed seems to be based more on speculation than evidence. I would point out that the district court's order requires by way of a final objective that the ratio of white to Negro teachers in each school be "substantially the same as it is throughout the system." Once the job has been largely accomplished, i.e., once the three-to-two ratio has been approached in each school, I think the language of the decree leaves room for flexibility based on administrative necessity.

2. The latest figures indicate that 39 of 1,-365 teachers in the system are teaching in schools of the opposite race.

believe this to be experimentation within the spirit of *Jefferson County.*

I do not regard United States v. Board of Education of Bessemer as good authority for eliminating the numerical ratios. While language in that opinion suggests the Court was not disposed to deviate in either direction from the *Jefferson* decree, it must be remembered that the district judge had not directed the board to go beyond the stage of allowing voluntary transfers of teachers willing to teach in schools of the opposite race. Being unfamiliar with the school system and having before it a record over a year old, the appellate court could do no more than impose the *Jefferson* decree with emphasis on the point that the school board must reassign teachers if the desired results are not achieved through voluntary transfers. Unlike a district judge who has detailed first-hand knowledge of schools and school officials in his area, our Court simply is not equipped at this time to determine specific objectives. Where a district judge has formulated specific provisions on the basis of a record, it is contrary to our decisions to eliminate them in favor of more general provisions. As stated by this Court in a civil rights case of another kind, a district court "has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." Pullum v. Greene, 5th Cir. 1968, 396 F.2d 251 [June 18, 1968], quoting from Louisiana v. United States, 380 U.S. 145 at 154, 85 S.Ct. 817 at 822, 13 L.Ed.2d 709.

### ON PETITIONS FOR REHEARING EN BANC

#### PER CURIAM:

The Petitions for Rehearing are denied and the Court having been polled at the request of one of the members of the Court and a majority of the Circuit Judges who are in regular active service not having voted in favor of it, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petitions for Rehearing En Banc are also denied.

Before JOHN R. BROWN, Chief Judge, and WISDOM, GEWIN, BELL, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, SIMPSON, CLAYTON * and MORGAN, Circuit Judges.

JOHN R. BROWN, Chief Judge, with whom WISDOM, THORNBERRY, GOLDBERG, and SIMPSON, Circuit Judges, join (dissenting):

I dissent from the denial of the rehearing en banc.

In pursuing the ideal of Circuit-wide uniformity which is enhanced by tinkering as little as possible "with the model decree" of *Jefferson* I and II [1] as was so recently reiterated in *Bessemer,* [2] the panel decision mistakenly concludes that *Bessemer* holds that *Jefferson* and the model decree forbid the District Judge from fixing numerical-percentage ratios of teacher integration. The mistake is unfortunate because in the name of uniformity it begets disparity, not just Circuit-wide, but within the single state of Alabama.

Certainly *Jefferson* lays no such restraint on the District Judges who are on the firing line—just the opposite was declared. "We anticipate that when district courts and this Court have gained more experience with faculty integration, the Court will be able to set forth standards more specifically than they are set forth in the decrees in the instant cases. * * * [T]he district court should be able to add specifics to meet the particu-

---

* Judge Clayton did not participate in the vote on rehearing en banc due to illness.

1. United States v. Jefferson County Board of Educ., 5 Cir., 1966, 372 F.2d 836 (Jefferson I) aff'd en banc, 5 Cir., 1967, 380 F.2d 385 (Jefferson II), cert. denied sub nom., Caddo Parish School Bd. v. United States, 1967, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103.

2. United States v. Board of Educ. of Bessemer, 5 Cir., 1968, 396 F.2d 44, [June 3, 1968].

lar situation the case presents." Jefferson I, 372 F.2d at 893–894.

Any such prohibition would be out of character with the dominant theme so simply expressed and which has now both weathered the storm of certiorari and enjoys the judicial compliment of acceptance. For we there declared, "The only school desegregation plan that meets constitutional standards is one that works." Jefferson I, 372 F.2d at 847.[3]

And in May 1968—two months before *Carr*—that is exactly what the Supreme Court said in *Green:* [4] "The burden on a school board today is to come forward with a plan that promises realistically to work, and promises realistically to work *now*." 391 U.S. at 439, 88 S.Ct. at 1694, 20 L.Ed.2d at 724.

Unfortunately, if not tragically, the panel's decision recognizes that the School Board's indefinite plan *will not work*. "At the outset we note that the testimony of school officials indicates a need for specific directives in the instant case." [5] As corroboration of this candid confession the Court then footnotes (n. 5) extensive testimony of a responsible member of the school board. Superintendent Garrett explicitly states that he does not even know what the objectives of the earlier District Court order are, when faculty desegregation will be complete, and that he and the Board have been unable to arrive at a workable definition of the model decree's standard of a "faculty not recognizable as being staffed for a particular race."

Specifics are needed. Specifics are needed by the school administrators. Specifics are needed by the Negroes who have waited these 14 years for "a bona fide unitary system where schools are not white schools or Negro schools—just schools" [6]—and who must now wait for an undefined time for the tell-tale mark of segregated faculties to pass away. Specifics are needed by children, Negro and white alike, who are entitled to witness, feel, and participate in the continuing lesson of a constitutional order that is color free.

Specifics—imperatively needed—are not forbidden by *Bessemer*.

The language the Court there used [7] was geared very carefully to that case. The decree proposed by the Government had never been submitted to the District Judge. It was a decree for us as a Court of Appeals to enter as a binding mandate on the District Judge. Worse, it was a decree constructed on assumed racial statistics and ratios for application over a period of three years in no way covered or substantiated by a record which was then over a year old and stale, if not silent, on what had been happening.

But it is a mistake to think that this was an acquiescence in the Board's suggestion that it all be left as it had been in the past—and now seems to be left for Montgomery—to the good faith efforts of the school board.

But we did do four things. The first was to rule out the voluntary approach. The second was to fix an immediate target date, for the School Board to report specifically what it had done and would do for the school year 1968–69. The

---

3. Different only in phrasing was this statement:

   "As the Constitution dictates, the proof of the pudding is in the eating: the proof of a school board's compliance with constitutional standards is the result—the performance. Has the operation of the promised plan actually eliminated segregated and token-desegregated schools and achieved substantial integration?" 372 F.2d at 894.

4. Green v. County School Bd. of New Kent County, Va., May 27, 1968, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716.

5. Montgomery Bd. of Educ. v. Carr, 5 Cir., 1968, 400 F.2d 1, 5 [August 1, 1968].

6. Jefferson I, supra, 372 F.2d at 890.

7. "We are requested to do both too much and too little. The school boards * * * urge us, in effect, to do nothing specific either in terms of target dates or racial percentage ratios, or both. The government, on other hand, proposes that we direct the entry of a proposed sweeping, detailed decree which it frankly acknowledges, adds to and extends *Jefferson*." *Bessemer*, supra, 396 F.2d at 49 [June 3, 1968].

third was to fix the date—implicit in *Jefferson*—for full compliance, as the beginning of the school year 1970–71. Fourth, we declared that since Negroes were not to be required to wait until "C-day"—1970–71, to see the evidence of compliance, we sounded in the plainest of words that *specifics* were now the order of the day. Specifics in June–August for the school year 1968–69. More so, specifics for the succeeding year 1969–70, leading to the climax of September 1970.[8]

Loath as judges are to articulate constitutional goals or actions in the oft-disparaged mechanical terms of arithmetic, this is an area where it is not the spirit, but the bodies which count. Any less inevitably leaves performance to good faith. Good faith is, of course, needed. But good faith is not, and cannot be, the standard. Now, and each term, each school year it comes down to figures. The result is in figures. If the result is satisfactory it is because of numbers, not the effort or subjective motivation. If the result is unsatisfactory it is likewise because of numbers. The numbers—i. e. the numerical percentage ratios—need to be fixed. Once fixed, the Court can always determine whether a good faith effort of compliance has been made. But good faith there is relevant to compliance, not as an element in fixing the standard.

The statistics in this record are abundant and graphic. Without passing judgment on motives or performance the figures of February 1968 either undisputed or found by the Court show that integration of the student body under the freedom of choice plan has been slight.[9] Faculty integration reveals a similar lack of numerical progress much of which, the District Judge expressly finds, is a result for which the Board must bear the full responsibility.[10]

8. "This leaves the problem of the ultimate 'C Day.' We think it entirely consistent with *Jefferson* to say that full compliance should be reached by the opening of the school year 1970–71. But since that is just two school years away and neither the Court nor the Negro plaintiffs should have to run the risk of an announced failure on the eve of school opening in 1970–71 it is perfectly evident that the District Judge in the forthcoming June–August proceedings must exact or impose specific targets. That will be repeated, only more so, as time marches on into 1969, then into 1969–1970." Bessemer, supra, 396 F.2d at 52 [June 3, 1968].

9. The District Court found that of 25,000 white children and 15,000 Negro children, there were approximately 550 Negro children attending traditionally white schools. No white children were attending traditionally Negro schools. These facts, as to which there is no substantial contradiction, as well as the facts and quotations in n. 10 are from the Memorandum Opinion of the United States District Court for the Middle District of Alabama, filed February 24, 1968.

10. The teacher force comprised approximately 550 Negro teachers and 815 white teachers. Only 32 classroom teachers in the system were teaching pupils in schools that were predominantly of the opposite race. "Practically all the faculty desegregation in the system has occurred in the high schools. While there is some faculty desegregation in the elementary schools in the system, it is extremely small. There has been very little, if any, faculty desegregation in the schools located outside the City of Montgomery." Of the 26 white teachers hired since September 1967, only 6 or 7 have been placed in predominantly Negro schools. All six Negro teachers hired since that date were assigned to predominantly Negro schools. "The evidence further reflects that the defendants have failed to take any appropriate steps to insure that substitute teachers are placed on a nonracial basis. No Negro has yet been a substitute teacher in a traditionally white school in Montgomery County." During the 1967–68 school year, white substitute teachers were employed over 2,000 times—only 33 of them in traditionally Negro schools. "Defendants have adopted no adequate program for the assignment of student teachers on a desegregated basis. None of the approximately 150 students teachers used in the Montgomery County School System in the fall of 1967 were assigned to schools predominantly of the opposite race. Four Negro student teachers have very recently been assigned to predominantly white schools. There has been no faculty desegregation in the night schools, operated by the Montgomery County School System." Moreover, on findings,

After extensive hearings, the District Court, dissatisfied with this lack of demonstrable accomplishment, imposed specific targets for the school year 1968–69 and more specifically, delineated what would be required for satisfactory compliance in order to achieve full faculty integration. The system-wide ratio of white to Negro faculty members is approximately 3 to 2. To attain schools unidentifiable as to race the Judge laid down the standard of a system-wide faculty ratio of 3 to 2. For the school year 1968–69 the Court set an interim compliance ratio of 5 to 1. In addition, the District Court imposed for the 1968–69 school year, the system-wide 3 to 2 faculty ratio for use in assigning substitute teachers, student teachers, and night school faculty members (using the night school faculty ratio).

But much of this was, I fear, undone by the panel. Recognizing in so many words the necessity for "specific directives in the instant case" the Court's opinion does not afford that guidance and, worse, makes drastic alterations in the Trial Judge's record-based, carefully constructed program. Although the change in the formulation of the 1968–69 ratio of 5 to 1 [11] may be slight in operative effect it does not stand alone. Completely eliminated is the 1968–69 ratio of 3 to 2 for substitute, student, and night school teachers. More significant is the complete elimination of the 3 to 2 ratio as the *Jefferson* goal of a school "unidentifiable as to race." Indeed, it is rejected for all time under the vague notions [12] which permit subjective discrimination of the kind so characteristic of the regional glacial movement toward integration. Right along with this is the failure, either on original disposition or now in response to an express request on the motion for rehearing, that full compliance be required by the opening of the school year 1970–71 as fixed by "C day" in *Bessemer*.

Within scarcely 90 miles that separates the Birmingham area from Montgomery there are two separate standards and, perhaps, two separate hopes.

We owe both to those to be commanded by, and those who enjoy the benefit of, court direction, an obligation to speak with a single voice. Whatever might be the ultimate views on the merits, law and all suffer when the Court, from "an inability to muster a majority," [13] cannot make up its institutional mind.

DYER, Circuit Judge:

I join in dissenting to the denial of a rehearing en banc.

---

not here challenged, the record failed to show any excuse for this lack of tangible accomplishment. "The evidence does not reflect any real administrative problems involved in immediately desegregating the substitute teachers, the student teachers, the night school faculties, and in the evolvement of a really legally adequate program for the substantial desegregation of the faculties of all schools in the system commencing with the school year of 1968–69." See n. 9 supra.

11. "Because of the difficulties inherent in achieving a precise five-to-one ratio, this part of the district court's order should be interpreted to mean *substantially* or *approximately* five to one. The decree is modified to this extent in order to allow a degree of flexibility in the application of the 1968–69 interim requirements." Carr, supra, 400 F.2d at 8 [August 1, 1968].

12. "Although a ratio of substantially or approximately five to one is a good beginning, we cannot say that a ratio of substantially three to two, simply because it mirrors the racial balance of the entire faculty, must be achieved as a final objective. Consideration must be given to the availability of teaching personnel, sound school administrative procedure, and other important factors." Carr, supra, 400 F.2d at 8 [August 8, 1968].

13. Carter v. United States, 5 Cir., 1963, 325 F.2d 697, 707 (en banc) (dissenting opinion), cert. denied, 1964, 377 U.S. 946, 84 S.Ct. 135, 12 L.Ed.2d 308.