UNITED STATES of America,
Appellant,

v.

INDIANOLA MUNICIPAL SEPARATE
SCHOOL DISTRICT et al.,
Appellees.

INDIANOLA MUNICIPAL SEPARATE
SCHOOL DISTRICT, Appellants,

v.

UNITED STATES of America,
Appellee.

No. 25655.

United States Court of Appeals
Fifth Circuit.

April 11, 1969.

Rehearing and Rehearing En Banc
Denied July 25, 1969.

H. M. Ray, Oxford, Miss., Stephen J. Pollak, Asst. Atty. Gen., Frank M. Dunbaugh, Dorothy Battle Rankin, Robert T. Moore, Attys., Dept. of Justice, Washington, D. C., for appellants.

Frank O. Crosthwait, Jr., Oscar B. Townsend, Indianola, Miss., Semmes Luckett, Clarksdale, Miss., for appellee.

Before DYER and SIMPSON, Circuit Judges, and CABOT, District Judge.

SIMPSON, Circuit Judge:

The principal issue on this appeal is the adequacy of the school desegregation plan approved by the district court for the Indianola, Mississippi, Municipal Separate School District. Companion issues concern government and school board objections to the faculty desegregation aspects of the district court's decree.

The desegregation plan adopted by the Indianola School Board combines geographic zoning for pupils living within the corporate limits of Indianola and free choice for all students living outside the city limits but within the school board's jurisdiction. There are two geographic zones, each of which contains a high school and an elementary school.[1] The two zones are divided by an irregular east-west line drawn along a railroad track and a fairly wide bayou, Indian Bayou. (See map in appendix). At the time of the plan's adoption in 1965–1966, there were eight white students living in the attendance zone south of this line (hereinafter referred to as Zone I) and eleven Negro students living in the attendance zone north of this line (hereinafter referred to as Zone II). The record reflects that for the current school year there are no Negro children living in Zone II and no white children residing in Zone I. Students in the free-choice area chose to attend schools in which their race was predominant and this, combined with the residential pattern of the city, resulted in not one child in the Indianola School District receiving an integrated educational experience during the 1968–1969 school year.[2]

We state at the outset that the present plan of operation of the Indianola Municipal Separate School District is constitutionally defective. The Supreme Court's recent trilogy of cases[3] demonstrates that "the burden on a school board today is to come forward with a plan that promises realistically to work, and promises realistically to work *now*." (Original emphasis). Green v. School Board of New Kent County, 391 U.S. 430, 439, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716, 724 (1968). A plan does not promise realistically to work now if it presently provides no desegregation whatever. Two of the four schools in Indianola are entirely Negro. The other two schools do not have one Negro student. The school board candidly admits that it expects little, if any, change in the status quo. Not only does this plan offer no prospect of working now, but it offers virtually no prospect of ever working.

---

1. In one zone are Lockard Elementary School and Indianola High School which are attended presently only by white students. Carver Elementary School and Gentry High School, all-Negro schools, are located in the other zone.

2. The plan had produced only the very slightest integration prior to the current school year. In 1965–1966, no children attended desegregated schools. In 1966–1967, six Negro children chose to attend schools where their race was not predominant and ten Negro children attended predominantly white schools under court order. In 1967–1968, three Negro children chose to attend the predominantly white elementary school.

It should be noted that the geographic zones have produced no desegregation whatever since their inception and that no white students with the possible exception of two Mexican children have chosen to attend predominantly Negro schools.

3. Green v. School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); Raney v. Board of Education of Gould School District, 391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727 (1968); Monroe v. Board of Commissioners of City of Jackson, Tenn., 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968).

■ The school board advances several nondiscriminatory reasons for its decision to implement the combined geographic-zoning, free-choice plan. As this Court has recently stated, however, these reasons cannot be accepted if the plan's implementation fails to result in substantial desegregation.

"If in a school district there are still all-Negro schools or only a small fraction of Negroes enrolled in white schools, or no substantial integration of faculties and school activities then, *as a matter of law*, the existing plan fails to meet constitutional standards as established in Green." (Emphasis added).

Adams v. Mathews, 5 Cir. 1968, 403 F.2d 181, 188. Despite what we have just said, we believe it appropriate to comment on some of the factors considered by the school board in adopting the plan. The board stressed, among other things, (1) the safety of the children, (2) proximity of residences to schools and (3) maximum utilization of existing facilities. Certainly, each of these is a relevant consideration for any plan which the board may hereafter adopt. However, none of these factors or even all combined are of the overriding importance of the one factor the Indianola School Board did not consider: effective promotion of desegregation. See Henry v. Clarksdale Municipal Separate School District, et al., 5 Cir. 1969, 409 F.2d 682 [March 6, 1969]. It is clear that drawing a zone line dividing the city into two racially identifiable sectors is not the most promising course of action open to this school board.

The Board's concern for the safety of children who would have to cross railroad tracks or a bayou in order to attend school is entitled to weight, but we find it unconvincing in the context of developing a desegregation plan appropriate for Indianola. Until 1965, when the school board took its first action to comply with the Brown [4] decision of eleven years earlier, students of both races freely crossed these hazards in order to maintain the racial purity of Indianola's schools. Cf. Henry v. Clarksdale Municipal Separate School District, supra, 409 F.2d at n. 10, p. 688. In addition, uncontradicted testimony shows that no trains pass through the city at any time remotely close to when school activity would be in progress. Because of the location of the city's schools, some white students must cross busy U. S. Highway 82 in order to attend schools in Zone II. Those students are protected by assignment of city police as safety patrol during school hours. Some arrangement of this sort could be employed if the tracks and bayou prove to be more of a safety hazard than is shown in this record.

The record reveals that the southwest corner of Zone II is composed of white students who might attend schools in Zone I if the dividing line were continued along the railroad tracks instead of diverted to follow the bayou.[5] Moreover, those white students exercising freedom of choice all chose to attend schools in Zone II regardless of their closeness to them. Thus, we do not see proximity of residence as a crucial factor.[6]

As for the maximum utilization of existing facilities, the record shows that

4. Brown v. Board of Education (Brown I) 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

5. The record is unclear as to whether the students in this area actually live closer to the "Negro" schools or "white" schools. The school board admits in its brief that at least one student lives equidistant from Carver and Lockard. See map in appendix for approximate location of these residences and their approximate distances from schools in the two zones.

6. The City of Indianola is a town of about 10,000 persons. No pupil residing within the corporate limits is more than a mile from any school in the district. The students in the free-choice area apparently live more than a mile away from the schools, but Mississippi law permits the school board to provide transportation for any students so situated. The entire school district comprises an area of 130 square miles. There are 3,-725 pupils residing in the district, including 2,708 Negro children and 1,017 white students.

the current plan provides no aid toward reaching that goal. The pupil to classroom and pupil to teacher ratios between the "Negro" schools and the "white" schools have only gradually been equalized since 1965–1966, and the equalization was not the result of this plan. Rather, portable classrooms were employed at Gentry High School and Carver Elementary School, and more Negro teachers were hired for these schools. Thus, the Board's plan did not always attain the nonracial goals for which it was selected.

We repeat the obvious. It is an *affirmative duty* of each school board in this circuit to abolish the vestiges of state-compelled segregation and to establish a unitary system which achieves substantial desegregation. United States v. Greenwood Municipal Separate School District et al., 5 Cir. 1969, 406 F.2d 1086 [February 4, 1969]; Anthony et al. v. Marshall County Board of Education, 5 Cir. 1969, 409 F.2d 1287 [April 15, 1969]. At the very least, this means that this school board has an obligation to see that schools in its district remain no longer all-Negro schools or all-white schools enrolling only an infinitesimal fraction of Negro students.[7]

There are many alternatives for the school board.[8] It may decide to retain the basic idea of geographic zoning. If so, zone lines could be drawn north to south so as to promote greater desegregation. A modification of the present line could be adopted so as to closely follow the railroad tracks and to extend beyond the corporate limits of Indianola.[9] Whatever geographic zones are contemplated, the school board must realize that geographic zoning is acceptable "only if it tends to disestablish rather than reinforce the dual system of segregated schools". United States v. Greenwood Municipal Separate School District, supra; Henry v. Clarksdale Municipal Separate School District, supra. Guidelines for the board have been established by this Court in Davis v. Board of School Commissioners of Mobile County, Ala., supra, note 7. There, we said that the school board must make surveys to determine the racial character of its residential areas and that zone lines must be drawn to promote desegregation rather than perpetuate segregation. Although we approved the use of such objective criteria as safety factors, we added this caveat: " * * * a conscious effort should be made to move boundary lines and change feeder patterns which tend to preserve segregation." 393 F.2d at 694. See also Board of Public Instruction of Duval County v. Braxton, supra, note 7.

7. This minimum duty has been imposed and restated by a long line of decisions, including, among others, United States v. Jefferson County, 5 Cir. 1966, 372 F.2d 836, aff'd reh. en banc 380 F.2d 385, cert. den. sub nom. Cuddo Parish School Board v. United States, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967); Stell v. Savannah-Chatham Board of Education, 5 Cir. 1967, 387 F.2d 486; Davis v. Board of School Commissioners of Mobile County, Ala., 5 Cir. 1968, 393 F.2d 690; United States v. Board of Education of City of Bessemer, Ala., 5 Cir. 1968, 396 F.2d 44; Montgomery County Board of Education v. Carr, 5 Cir. 1968, 400 F.2d 1; Board of Public Instruction of Duval County v. Braxton, 5 Cir. 1968, 402 F.2d 900; Adams v. Mathews, supra; United States v. Greenwood Municipal Separate School District, supra; Henry v. Clarksdale Municipal Separate School District,

supra; Anthony v. Marshall County Board of Education, supra.

8. We do not regard freedom of choice as a viable alternative. The record is clear that the freedom of choice aspect of the Indianola plan has failed to produce any meaningful steps toward desegregation. See note 2, infra. Freedom of choice at best seems to be among the least effective methods to desegregate any school district in this circuit. See Moses v. Washington Parish School Board, 276 F.Supp. 834 (E.D.La.1967); Singleton v. Jackson Municipal Separate School District, 5 Cir. 1966, 355 F.2d 865.

9. The student population in the free-choice zone outside the corporate limits of Indianola is predominantly Negro. Thus, any extension of any zone line would have to result in more Negro pupils attending Lockard and Indianola than at present.

We consider it important for this school district to include the incorporation of a majority to minority transfer provision into whatever plan is finally adopted. Consideration should be given to the creation of an educational park or the pairing of schools. While we do not undertake to decide what is a proper plan, we urge close consideration of a pairing plan. Communities as small as Indianola with only two elementary and two high schools are unusually well suited for such a plan. For example, grades one through four could be assigned to Lockard Elementary School, and grades five through eight, to Carver. Grades nine and ten could be assigned to Gentry High School, and grades eleven and twelve, to Indianola.

Both the government and the school board are dissatisfied with the trial court's ruling with respect to desegregation of faculties. We may quickly dispose of the school board's complaints. The school board asks nothing less than to be excused from compliance with this Court's holding in *Jefferson*. Needless to say, we have not knowingly permitted any school board to refuse to comply with *Jefferson*, and we will not begin to do so today. The record shows that there are no Negro teachers at either Lockard or Indianola schools. One white teacher is present for a half-day at Gentry, and there are not white teachers at Carver. For all intents and purposes, these schools have racially segregated faculties. As the trial judge recognized and as we reemphasize here today, such a situation is no longer permissible for schools in this circuit.[10]

"The transformation to a unitary system will not come to pass until the board has balanced the faculty of each school so that no faculty is identifiable as being tailored for a heavy concentration of Negro or white students."

United States v. Greenwood, Municipal Separate School District, supra, 406 F.2d at 1094. This goal must be accomplished by the beginning of the 1970–1971 school year. United States v. Board of Education of City of Bessemer, Ala., supra, note 7.

▋ We realize that compliance with this directive may be difficult. It may be more difficult because the board has waited so long to take any affirmative action. The school board must *actively seek out* qualified instructors who are willing to teach children of any color. The voluntary approach is demonstrably not adequate, and the school board must do everything within its power to recruit and reassign teachers so as to provide for a substantial degree of faculty integration.

▋ The government objects to that portion of the trial court's order which *authorizes* the school board to withhold approval of teacher contracts unless such contracts help achieve faculty desegregation. The government desires that the directive to withhold approval in certain circumstances be made mandatory. We agree that the school board *must* withhold approval of teacher contracts if that is necessary to achieve more racially balanced faculties. "The board's responsibility is not optional: It must withhold approval of contracts if necessary to achieve faculty desegregation." United States v. Greenwood Municipal Separate School District, supra, 406 F.2d at 1094.

▋ Further, the board must transfer and reassign teachers between the schools in its district if necessary. State laws which hinder or prevent the taking of steps we have outlined above "may not be interposed to frustrate a constitution-

10. The board suggests that faculty desegregation is inappropriate for Carver and Gentry, since the record shows that no white students have ever attended or will ever attend these schools regardless of the racial composition of the faculty. The board misapprehends the function of teacher desegregation. Non-racial assignment of faculty members is not merely an inducement to attract pupils to a school where their race is a minority, but the policy is an essential constituent both educationally and constitutionally of any final plan of converting to a unitary school system.

al mandate." United States v. Greenwood, Municipal Separate School District, supra; United States v. Board of Education of City of Bessemer, supra.

The school board explicitly argues that the faculty desegregation requirements we impose today will result in wholesale withdrawal of white students from the school system. The board believes that this will cause the schools to lose the public support they need to function effectively. The principal answer to these speculations is that those who disagree with constitutional imperatives cannot avoid their application. Monroe v. Board of Commissioners of City of Jackson, Tenn., et al., supra, note 3, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d at 739. Our system of a government of laws surely could not survive if it were otherwise. Further, there is no competent evidence and can be none as to the vitality of this school district operating under constitutional principles, since the district has not yet attempted full compliance with these principles. The attitudes of individuals and regions can be changed by persuasion and logic. We are not convinced that the white residents of Indianola or any city wherever located would choose the destruction of their school system over its compliance with constitutional mandates.

We do not intimate any view as to the good faith of this school board since 1965. But good faith is not the standard. "Good faith is relevant only as a necessary ingredient of an acceptable desegregation plan." Henry v. Clarksdale Municipal Separate School District supra, 409 F.2d at 684. We expect and require not only good faith, but positive action to dismantle the dual system of school attendance in Indianola. Evidence of such a liquidation and the accompanying operation of a unitary system of biracial attendance at all schools in the district must be forthcoming. We do not impose any absolute ratio or percentage requirement, but we are firm that a point has been reached in the process of school desegregation "where it is not the spirit, but the bodies which count." Montgomery County Board of Education et al. v. Carr et al., on petitions for rehearing en banc, 5 Cir. 1968, 402 F.2d 782 [November 1, 1968] (dissenting opinion p. 786). The district court must evaluate any plan adopted by the school board in this light. Potential for a unitary system and good faith are not the yardsticks by which any prospective plans are to be measured. They must meet one single criterion: they must work now.

We conclude by directing that the district court require the school board without delay to formulate a plan within the guidelines expressed in this opinion. The 1970–1971 school year is not far off, and no progress has yet been made toward a unitary school system with both substantially desegregated student bodies and teaching staffs. In addition, we remind both the district court and the school board that effective desegregation as defined by *Jefferson* requires not only integration of faculty, staff and students, but also integration of services, facilities, extracurricular activities including athletics, transportation and all other aspects of a community's educational program.

The district court should conduct additional hearings and make further fact findings on the choice of a new plan by the Indianola School Board to eliminate the dual system which still exists. The new plan should be evaluated in light of *Green, Greenwood, Clarksdale, Anthony,* and what we have said today. The district court should treat school desegregation cases as entitled to the highest priority [11] and should move quickly so that a new plan may be approved and operable by the 1969–1970 school year. The judgment of the court below is reversed, and the case remanded for further proceedings not inconsistent with this opinion.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC.

PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.

11. Adams v. Mathews, supra, 403 F.2d at 188.

## APPENDIX

CORPORATE LIMITS
of the
CITY OF INDIANOLA, MISSISSIPPI
JUNE, 1965

PREPARED BY: ROBERT A. MONTGOMERY P.E.

REVISIONS:

1 - Carver Elementary School
2 - Gentry High School
3 - Lockard Elementary School
4 - Indianola High School