Jean Carolyn **YOUNGBLOOD** et al.,
Plaintiffs-Appellants,

**United States of America, Plaintiff-
Intervenor-Appellant,**

v.

**BOARD OF PUBLIC INSTRUCTION OF
BAY COUNTY, FLORIDA, et al.,**
Defendants-Appellees.

No. 29369.

United States Court of Appeals,
Fifth Circuit.

July 24, 1970.

Rehearing Denied Sept. 11, 1970.

Theodore R. Bowers, Panama City, Fla., Jack Greenberg, Drew S. Days, III, New York City, for Jean Carolyn Youngblood.

William Stafford, U. S. Atty., Tallahassee, Fla., Dorothy B. Rankin, Washington, D. C., for appellant.

Julian Bennett, Panama City, Fla., for defendants-appellees.

Before WISDOM, COLEMAN, and SIMPSON, Circuit Judges.

WISDOM, Circuit Judge:

The Board of Public Instruction of Bay County, Florida, faces fewer desegregation problems than do most school boards. This Court found, last December, that the freedom of choice plan in Bay County "has produced impressive results",[1] although "it fall[s] short of establishing a unitary school system".[2] As of February 6, 1970, there were only 3,028 blacks (17%) as compared with 14,629 whites (83%) enrolled in public schools.[3] There are only three schools (Rosenwald Junior High and Harris and Patterson elementary schools) that pose a serious problem. These were originally built to serve Negroes in a Negro residential area in Panama City, but the area is not extensive and the combined enrollment of pupils in these schools is only 1,413 or less than seven per cent of the total school population of the district. There is no serious busing problem.[4] Bay County, located in the Florida panhandle, has a population of 70,000. Most of its residents and schools are in the Panama City area.

After the Supreme Court's holding in Carter v. West Feliciana Parish School Board, 1970, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477, a companion case to this case, and after remand of this case to the district court, the School Board and the Health, Education, and Welfare Department filed desegregation plans. HEW acted through the Florida School Desegregation Consulting Center, University of Miami. The Center is partially funded by HEW and works with the Office of Education in school desegregation matters within the State of Florida to devise desegration plans. A plan was formulated by a team from the Center, headed by Dr. Gordon Foster of the University of Miami, who is Director of the Center, and composed of eleven staff members, and nine special consultants, including educators from two other Florida school districts and from faculties of several universities both in Florida and in other states.[5]

The Board filed objections to the HEW plan and on January 14 filed a proposed plan which called for the conversion of the three remaining black

---

1. This is one of the en banc school cases decided by this Court on December 1, 1969. Singleton v. Jackson Municipal Separate School District, 5 Cir. 1970, 425 F.2d 1211, rev'd in part. Carter v. West Feliciana Parish School Board, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477, January 14, 1970.

2. Id.

3. The Bay County school system is composed of 2 senior high schools, 4 junior high schools, 19 elementary schools and 1 vocational school.

4. The record is not fully developed on the amount of transportation required under the two plans. The Superintendent testified that implementation of the HEW plan would require the busing of 897 students more than the 5,134 being bused under free choice. However, of the students being bused, only 3,117 lived more than 2 miles from school and so were required by Florida law to be transported.

In this regard, the record indicates that Bay County transported 6,297 students in 1968–69. For that year, only four schools in the system had no transported students. Harris was the only Negro school without bused students. The system currently operates 45 buses.

5. The desegregation plan prepared by the Florida School Desegregation Consulting Center (HEW) had three key objectives:
(1) Moving the Bay County schools from a freedom of choice assignment pattern at the junior and senior high and elementary grade levels to assignments by geographic zones at all levels;
(2) Desegregating the student bodies at the three schools which were currently all-black or nearly so—Harris Elementary, 100% black; Patterson Elementary, 99.7% black; and Rosenwald Junior High, 100% black; and
(3) Desegregating the schools in such a manner as to minimize additional transportation costs and at the same time lessen the probability of "white flight" or the transfer of students to private schools.

schools to special centers and the assignment of regular black students to white schools. On January 26, the day before the hearing in the district court, the school board filed an Amended Proposed Plan, which provides for geographic attendance zones for all schools of the system. This Amended Plan stated that the Board had formally rescinded its previous plan.

Under all three plans, the school board would move from a free choice system to a geographic zoning system. The essential difference in the plans is that under the Board's plan there would be little desegregation in the remaining Negro schools [6] and for at least one of these schools it appears the zone was drawn in a manner that restricts desegregation. In contrast, under the HEW plan an affirmative effort is made to desegregate the three schools and to do so in such a manner as to "minimize additional transportation costs and at the same time lessen the probability of 'white flight' or the transfer of students to private schools." [7]

We turn now to the three problem schools, traditionally all-Negro. Rosenwald, which originally served grades 7–12, has a capacity for 1,000 students. Since the high school grades were phased out, the school has served only 350 Negro junior high students. At the same time the three white junior highs have been filled to capacity for several years. However, rather than assign white students to Rosenwald to relieve overcrowding, the Board established seventh grades at two white elementaries,

Millville and Hutchison Beach, which enroll about 450 junior high age students.

The Board's zone for Rosenwald is not based on the school's full capacity, but rather duplicates the limited enrollment of the school under free choice. Thus, while the school has a capacity of 1,000, the Board's zone was drawn to fill the school to half that number (505), and the actual enrollment in February (350) constitutes about ⅓ of the school's full capacity. The effect is to restrict the geographic area which the school serves, with the result that the school remains predominantly black.

In contrast, HEW proposed zoning 820 students into Rosenwald, about 180 less than full capacity (which would leave space for some special classes or projects, such as the Educable Mentally Retarded Unit). Thus, the attendance zone would necessarily cover a larger geographic area, with the result that a greater number of white students would be within the Rosenwald zone. There would be sufficient space in the junior highs for the special seventh grades at Millville and Beach elementaries to be absorbed in the regular junior high program.

Under the Board's plan, Patterson and Harris would each serve grades K–6. Because of residential patterns both schools remain majority Negro. As of February 6, Harris had only 3 of a projected 16 whites enrolled, while Patterson was attended by 115 of a projected 171 whites.

6. The Superintendent testified that the zones for the black schools were drawn by the principals of these schools and were drawn without regard to race. He testified no attempt was made to determine how many blacks and whites were in each zone; that no attempt was made to draw zones so as to have both blacks and whites represented; and that no attempt was made to draw the zones so they would affirmatively promote desegregation.

7. The effect of the two plans on the three traditionally Negro schools is shown by the following chart:

| School | Cap. | 9/1969 Enrollment | | | HEW Proj. Enrollment | | | Bd's Proj. Enrollment | | | 2/1970 Enrollment | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | W | N | T | W | N | T | W | N | T | W | N | T |
| Rosenwald | 1000 | 0 | 377 | 377 | 629 | 191 | 820 | 127 | 378 | 505 | 75 | 275 | 350 |
| Harris | 650 | 0 | 595 | 595 | 256 | 82 | 338 | 16 | 593 | 609 | 3 | 472 | 475 |
| Patterson | 680 | 2 | 626 | 628 | 324 | 84 | 408 | 171 | 485 | 656 | 115 | 473 | 508 |

In order to reduce the probability of white flight from these schools and their re-segregation, HEW proposed that Harris and Patterson schools be paired with nearby white elementaries. Under this proposal, Patterson would be paired with Millville (approximately 2 miles away) in a single geographic zone. Harris would be paired with Northside, approximately 2½ miles away, in a similar large zone.

All students within each zone would attend grades K–3 at the white school, and grades 4, 5, and 6 at the Negro school. Under such a combination geographic zone—pairing assignment provision, each school would have a substantial white enrollment. HEW projected that under its proposed zones, each school would be about 75% white.

As Florida law requires students living more than two miles from their school to be transported, the pairing proposal would necessitate the transportation of a number of students. Of these schools, only Patterson has had a substantial number of its students transported in the past.

At the elementary level, HEW also proposed retaining two "transportation islands", or small non-contiguous zones, previously employed by the Board to implement district court orders directing that Negro schools be closed and their students reassigned to white schools. The limited number (not more than 71) Negro students from these small zones would be transported to two traditionally white elementaries. However, even if these students were assigned to the schools nearest their homes, the HEW projections indicate it would not affect the majority white enrollments at the schools.

Despite the circumstances which suggest that a plan could be devised which would eliminate vestiges of discrimination in Bay County, the Board adopted a student assignment plan that to a great extent perpetuates "the comfortable security of the old, established discriminatory pattern". Monroe v. Board of Com-missioners, 1968, 391 U.S. 450, at 459, 88 S.Ct. 1700, at 1704, 20 L.Ed.2d 733.

According to the testimony of the Superintendent at the February hearing only 385 of the approximately 2530 Negro junior high and elementary students would be zoned into white schools under the Board's plan. This number is substantially less than the number of Negro students enrolled in these schools in September 1969 under the free choice plan. Thus, strict adherence to the geographic zones would have the effect of trapping Negro students in Negro schools. However, the Board adopted the policy of assigning to white schools all Negro students who had chosen to attend these schools under free choice, regardless of the location of their residences. Thus, the 1286 Negro students shown in the February report to be enrolled in white schools represents not only those zoned into white schools, but also all others who had selected them under free choice. At the same time, the three remaining Negro schools have enrollments of 60%–99% black.

The report with the court shows that as of February 6, of the 314 whites which the Board projected would be zoned into black schools only 193 of these were actually in attendance. This is hardly unexpected in light of the fact that in the past no whites (other than a handful of kindergarten students) had chosen to attend Negro schools, despite the Board's proposal to improve Negro schools in order to attract whites.

As we see it, the zone for Rosenwald should be based on the full capacity or nearly full capacity of that school, as proposed by HEW. (But see the last paragraph of this opinion.) Such a zone could, as the HEW proposal suggests result in a majority white student population at the school. At the elementary level, the Board made no affirmative effort to desegregate the two remaining Negro schools. Indeed, as the Superintendent testified, no attempt was made to determine the effect the Board's zones would have on desegregation and the Board rejected reasonably available

alternatives proposed by HEW which would have totally desegregated these schools.

The record contains suggested alternatives available to the Board which would totally eradicate all vestiges of the dual school system and deal with the problems of the flight of white parents and resegregation. This could be accomplished at the junior high level simply by drawing a zone on the basis of the full capacity of the school. At the elementary level, the Negro schools could be paired with white schools.

 This Court requires school boards to draw zone lines so as to affirmatively promote desegregation of racially dual school systems. Valley v. Rapides Parish School Board, 5 Cir. 1970, 423 F.2d 1132 [No. 29,237, March 6, 1970;] United States v. Indianola Municipal Separate School District, 5 Cir. 1969, 410 F.2d 626, cert. denied, 396 U.S. 1011, 90 S.Ct. 571, 24 L.Ed.2d 503; United States v. Greenwood Municipal Separate School District, 5 Cir. 1969, 406 F.2d 1086; Davis v. Board of School Commissioners of Mobile County, 5 Cir. 1968, 393 F.2d 690, 694; Henry v. Clarksdale Municipal Separate School District, 5 Cir. 1969, 409 F.2d 682; United States by Mitchell v. Choctaw County Board of Education, 5 Cir. 1969, 417 F.2d 838; Board of Public Instruction of Duval County v. Braxton, 5 Cir. 1968, 402 F.2d 900. We approve the pairing of schools to promote desegregation. See, e. g., Hall v. St. Helena Parish, 5 Cir. 1969, 417 F.2d 801 at 809; United States by Mitchell v. Choctaw County Board, 5 Cir. 1969, 417 F.2d 838 at 842; Board of Education of Oklahoma City v. Dowell, 10 Cir. 1967, 375 F.2d 158. See also Green v. County School Board of New Kent County, 391 U.S. 430 at 442, n. 6, 88 S.Ct. 1689, 20 L.Ed.2d 716; Raney v. Gould School District, 391 U.S. 443 at 448, 88 S.Ct. 1697, 20 L.Ed.2d 727.

 This Court's decisions in United States v. Greenwood Municipal Separate School Dist., 5 Cir. 1969, 406 F.2d 1086;

Henry v. Clarksdale Municipal Separate School Dist., 5 Cir. 1969, 409 F.2d 682, cert. denied, 1969, 396 U.S. 940, 90 S.Ct. 375, 24 L.Ed.2d 242; and United States v. Indianola Municipal Separate School Dist., 5 Cir. 1969, 410 F.2d 626, cert. denied, 1970, 396 U.S. 1011, 90 S.Ct. 571, 24 L.Ed.2d 503; accord, Valley v. Rapides Parish School Bd., 5 Cir. 1970, 423 F.2d 1132 [No. 29,337, March 6, 1970], makes abundantly clear that a school board does not meet its constitutional duty to disestablish the dual school system by drawing geographic attendance zones according to every other possible criterion except promotion of desegregation. Without such a consideration of a plan's ability to effect desegregation, geographic zoning is no more acceptable constitutionally than freedom of choice.

In *Greenwood*, we said:

Counsel for the school board argues that a geographic zone does not contravene the Fourteenth Amendment if it is drawn according to objected criteria and not along racial lines. This assessment of the equal protection clause as it applies to school desegregation fails to take into account the *affirmative duty* of school boards in this Circuit to abolish state-compelled educational segregation and establish in its place a unitary system. This affirmative duty was spelled out in *Jefferson* and reaffimed in *Green* and *Raney*.

*Id.* 406 F.2d at 1093.

 And in Henry v. Clarksdale, this Court declared a geographic zoning plan constitutionally impermissible where it was shown to freeze in past discrimination and to be formulated with concern for disturbing the patrons as little as possible in their established school attendance patterns rather than effecting desegregation. In a context where residential segregation was apparently present, the Court indicated that that factor was irrelevant to the constitutional issues:

\* \* \* The ultimate inquiry is not whether the school board has found

some rational basis for its action, but whether the board is fulfilling its duty to take affirmative steps, spelled out in *Jefferson* and fortified by *Green,* to find realistic measures that will transform its formerly de jure dual segregated school system into a unitary, non-racial system of public education.

*Id.* 409 F.2d at 687.

This Court went on to hold that basic criteria such as maximum utilization of school buildings, density of population, proximity of pupils to schools, natural boundaries and welfare of students could be used by school boards to determine zoning configuration, except where the net effect would be to freeze in past discrimination. In no event were "historical boundaries"—those that historically separated white and Negro residential areas—to be considered natural boundaries in arriving at attendance zones. *Id.,* 687–688. But these were not the only criteria necessary to meet constitutional requirements. As this Court indicated:

> * * * [T]here is a sixth basic criterion * * * promotion of desegregation. Jefferson, Stell, Davis, Braxton, Polk County, Carr, Bessemer, Adams, Graves and Greenwood, and other cases decided by this Court, and now Green v. County School Board of New Kent County, require school authorities to take affirmative action that will tend to eradicate all vestiges of the dual system. For example, given a choice of alternatives, a school board should draw zone lines, locate new schools, consolidate schools, change feeder patterns, and resort to other measures that will reduce the effect of past patterns tending to maintain segregation (or token desegregation). "Where the board is under compulsion to desegregate the schools * * * we do not think that drawing zone lines in such a manner as to disturb the people as little as possible,

is a proper factor in rezoning the schools."

*Id.,* at 688.

■ We reiterate what was said in United States v. Jefferson County, Board of Education, 5 Cir. 1966, 372 F. 2d 836, 876.

> The Constitution is both color blind and color conscious. To avoid conflict with the equal protection clause, a classification that denies a benefit, causes harm, or imposes a burden must not be based on race. In that sense, the Constitution is color blind. But the Constitution is color conscious to prevent discrimination being perpetrated and to undo the effects of past discrimination. The criterion is the relevancy of color to a legitimate governmental purpose.

At this point, and perhaps for a long time, true nondiscrimination may be attained, paradoxically, only by taking color into consideration. Accord, Board of Public Instruction of Duval County, Fla. v. Braxton, 5 Cir. 1968, 402 F.2d 900; United States v. Board of Public Instruction of Polk County, Fla., 5 Cir. 1968, 395 F.2d 66; Wanner v. County School Bd. of Arlington County, Va., 4 Cir. 1966, 357 F.2d 452; Dowell v. School Bd. of Oklahoma City, W.D.Okla. 1965, 244 F.Supp. 971, aff'd 375 F.2d 158 (10th Cir.), cert. denied, 1967, 387 U.S. 931, 87 S.Ct. 2054, 18 L.Ed.2d 993.

■ We again note that the Bay County School Board has "produced impressive results" in desegregation. At the same time, we have concluded that it has not gone far enough. We reverse and remand this case for proceedings consistent with this opinion. We suggest to the district court that it would be helpful to order that the team from HEW work with school officials to revise the geographic zones proposed by HEW on the basis of the up to date pupil locator maps. These proposals

should then be filed with the court and the parties permitted to file any objections or proposed modifications, after which the district court should hold a prompt hearing and shall approve a more effective desegregation plan to be put into effect in September 1970.

In the light of up-dated information and other pertinent facts, HEW and the Board should explore the feasibility of retaining the classrooms especially designed for the Educable Mentally Retarded Unit at Rosenwald School. Consideration should also be given to retention of the County-Wide Education Media Center at Rosenwald or its relocation at another school.

The judgment is reversed and remanded for proceedings consistent with this opinion.

COLEMAN, Circuit Judge (concurring in part and dissenting in part):

In this case, the Department of Health, Education and Welfare recommended that the Bay County Educable Mentally Retarded Program, established in 1967 at Rosenwald, be relocated. The majority of this Panel directs that the feasibility of retaining this program at Rosenwald be explored. In this I heartily concur.

In all other particulars I respectfully dissent. It seems to me that this decision again allows statistics, in isolation, to outweigh all other considerations. I would hold that Bay County in fact does have a public school system in which no child is deprived of the right to attend a school on account of his race or color.

I would not further disrupt this school system solely to attain a more evenly distributed racial balance, which, as I understand it, is not required by the Constitution if the school system is a unitary one.

I would affirm the Judgment of the District Court.