The **NATIONAL ASSOCIATION FOR NEIGHBORHOOD SCHOOLS OF PITTSBURGH, INC.,** and **Janet R. Podnar, on her own behalf, and as parent and Guardian of David R. Podnar, Jr., a minor, and Charles W. Wilhere, Jr. and Paula Y. Wilhere, his wife, on their own behalf and as parents and guardians of Michael Wilhere, a minor, and Patrick J. Zilles and Bonnie B. Zilles, his wife, on their own behalf and as parents and guardians of Jennifer B. Zilles and Heather L. Zilles, minors, and Charles F. Kern and Nancy Lee Kern, his wife, on their own behalf and as parents and guardians of Kristen M. Kern, a minor, all of the above Individually and on behalf of all Others Similarly Situated,**

v.

**BOARD OF PUBLIC EDUCATION OF the SCHOOL DISTRICT OF PITTS-BURGH, PENNSYLVANIA.**

**Civ. A. No. 80–1242.**

United States District Court, W. D. Pennsylvania.

Sept. 18, 1980.

472

Davis Max Baer, Pittsburgh, Pa., for plaintiffs.

Frederick Boehm, Pittsburgh, Pa., for defendant.

Ellen M. Doyle, Asst. Gen. Counsel, Pa. Human Relations Commission, Pittsburgh, Pa., for Pennsylvania Human Relations Commission.

## OPINION

ROSENBERG, District Judge.

This action was brought by the plaintiffs, The National Association For Neighborhood Schools of Pittsburgh, Inc. and four individuals as parents and guardians of minor children against the Board of Public Education of the School District of Pittsburgh, Pennsylvania (Board). The National Association For Neighborhood Schools of Pittsburgh is a corporation, not for profit, and avers that it has approximately 1800 individuals dedicated to preventing the forced assignment of students to schools on the basis of race, class, or ethnic origin. The plaintiffs bring this action in their own behalf and "on behalf of all others similarly situated". They bring it as a class action.

The defendant, Board, is the governing body of the Pittsburgh School District. This School District is a school district of Class 1A, pursuant to the laws of the State of Pennsylvania, as designated by the Commonwealth of Pennsylvania in 24 P.S. § 2–202.

The plaintiffs charge that the defendant School District, as part of its functions, "has implemented a full–time mandatory program which assigns children including the

named minor plaintiffs, to various schools based solely upon the race of those children."

The action, it is alleged, is brought under 28 U.S.C. § 1343(3) and (4) (civil rights)[1] and 28 U.S.C. §§ 2201, 2202 (declaratory relief).[2] Its basis for class action, it is alleged, lies in the authority given in Federal Rule of Civil Procedure 23(a) and (b)(2).[3] It also bases its action here on its claim that the action by the defendant was in violation of the Fourteenth Amendment of the United States Constitution.

What the plaintiffs by their pleadings and testimony desire of this court is not so much that the Board be stopped in its plan of desegregation by the use of the newly inaugurated busing system as commenced on September 2nd because of the compulsory busing of children "based solely upon race as implemented by defendant, pursuant to the Amended Pittsburgh Desegregation Plan", and a declaration that the method of selecting busing candidates among the children because of race is both unconstitutional and violative of the Civil Rights statutes; but rather and only that an end be put to compulsory busing as far as they are concerned.

The complaint seeks as a remedy of this court a declaration that the defendant has violated the Civil Rights Act of 1871, 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution, "by involuntarily assigning students to a particular school solely on the basis of race and/or establishing a quota system to achieve that end; and further declaring that defendant has violated the Civil Rights Act of 1964, 42 U.S.C. § 2000c through the use of compulsory busing to achieve that end"; and that this court issue a preliminary injunction to the plaintiffs in addition to awarding costs and attorneys fees, as well as for such other relief as this court may deem just.

An application for a preliminary injunction was filed at the same time and pursuant thereto, I granted a hearing for Friday, September 5, 1980, at 10:00 o'clock a. m. to determine whether a preliminary injunction should issue. A hearing was held on the matter and innumerable witnesses were presented by both the plaintiffs and the defendant.[4]

From the record and stipulation of counsel and from the evidence as a whole as presented by both parties, I make findings of fact.

1. § 1343 Civil Rights and elective franchise. "The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

   .     .     .     .     .

(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom, or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;
(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote."

2. § 2201. Creation of remedy. ". . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."
"§ 2202. Further relief. Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party

whose rights have been determined by such judgment."

3. Rule 23(a). Prerequisites to a Class Action. "One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."

(b) Class Actions Maintainable. "An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and . . . (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; . . . ."

4. The plaintiffs asserted at the hearing that an immediate injunction was not desired.

The Commonwealth of Pennsylvania amended the statute known as the Pennsylvania Human Relations Act, 43 P.S. § 951 et seq. in which it has constituted a Commission and authorized it to be concerned with racial balancing in the public school system.[5]

On March 8, 1968, the Human Relations Commission (Commission) directed the Board to submit a plan to correct the racial imbalance in Pittsburgh schools. Up to this time, the schools in the Pittsburgh system contained a large number of school buildings spread over various locations in the City. All of these were known as neighborhood schools. The neighborhood schools grew up with the character of population in which each of these schools existed. Thus, in an area which was heavily white in population, the character of the school population was heavily white, or if the neighborhood area was of a specific race, the character of the school population was of a specific race. This plan existed for many years before, and as the neighborhood changed or was influenced by the population of different kinds, so the character of the school population changed.

The Board until that time, as previous Boards had acted, permitted the system to grow and change as it did without any interference in accordance with the population of each neighborhood area.

The present approximate school population is 46,945 pupils. However, this population comprises residents of various ethnic and racial origin.

### RECENT SCHOOL HISTORY

In *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, the United States Supreme Court set forth a hitherto unpracticed principle that the opportunity to an education, "where the State has undertaken to provide it, is a right which must be made available to all on equal terms." 347 U.S. at 493, 74 S.Ct. at 691.

It was this principle which the Commonwealth of Pennsylvania through its agency, the Commission, adopted and put into practice what the Supreme Court had laid down as a mandatory directive to public school systems in the United States. The proposals, however, as submitted by the Board in its attempt to comply with the Commission's order, were found to be unacceptable. The Commission then began administrative procedure which led to a March 1971 final order requiring the Board to submit a plan to eliminate racial imbalance.

This order was appealed to the Commonwealth Court of Pennsylvania. The Commonwealth Court held in *School District of Pittsburgh v. Pennsylvania Human Relations Commission*, 6 Pa.Cmwlth. 281, 294 A.2d 410 (1973) that the Commission had a right to compel the Board to submit a plan under the Human Relations statute.

After that a series of negotiations between the Commission and the Board were held in an effort to arrive at a plan which would be in compliance with the directive of the Commission and be compatible with the Board's obligatory duties in the performance of its duties.

Pursuant to these negotiations, the Board submitted another plan in order to comply with the Commission's 1972 order.

This plan was also found unacceptable by the Commission.

In August 1976, the Commission sought enforcement through another action in the Commonwealth Court and on January 13, 1977, the Commonwealth Court upheld the Commission and the Board took an appeal to the Supreme Court of Pennsylvania.

On August 11, 1978, the Supreme Court of Pennsylvania affirmed the Commonwealth Court Order in *Pennsylvania Human Relations Commission v. School District of*

---

**5.** One of the purposes and policies of the Pennsylvania Human Relations Act, as enunciated by the State Legislature in § 952(b), "Findings and Declaration of Policy", is to "assure equal opportunities to all individuals and to safeguard their rights at places of public accommo- dation . . . regardless of race . . . ." The legislative definition of a place of public accommodation includes kindergartens, primary and secondary schools, and high schools (§ 954[*l*]) It is upon this authority which the Commission has here acted.

*Pittsburgh,* 480 Pa. 398, 390 A.2d 1238 (1978).

The Commonwealth Court then acting pursuant to the Supreme Court and upon remand ordered the Board to submit a plan to correct the racial imbalance on or before July 1, 1979. Such plan was submitted to the Commission in June 1979 and was again rejected by the Commission. Thereafter an amended plan was submitted to the Commission and was also rejected.

On April 15, 1980 the Board filed a Petition in the Commonwealth Court seeking declaratory relief to the effect that its amended plan was in compliance with the Order of Court of November 8, 1978.

The Commission responded with an answer and filed an application for rule to show cause why the Board should not be held in contempt.

An evidentiary hearing was held on July 21, 1980 in the Commonwealth Court. Incidentally, the present plaintiffs sought intervention in the Commonwealth Court at this time but that intervention was denied and such denial was upheld by the Supreme Court.

On July 24, 1980, the Commission applied to the Commonwealth Court to stay the implementation of the amended desegregation plan, because it did not go far enough in the efforts to unitize the Pittsburgh School system. The Commonwealth Court denied that application. No. 568 C.D.1971, Opinion filed July 24, 1980.

The Supreme Court affirmed, No. 80–2–305, Per Curiam, August 25, 1980.

The parties have offered into evidence the plan as it is now being instituted in the City of Pittsburgh with its effective date, September 2, 1980. That plan was inaugurated accordingly.

The complaint for the preliminary injunction was filed on the same day, September 2, 1980.

Before the Plan was first approved, the Board set up community hearings and meetings in which the public was invited for discussion and advice.

After the adoption of the Plan, the Board commenced a series of activities for the purpose of being able to inaugurate the Plan as of September 1980.

In the meantime, it is appropriate that we here explain the meaning of some of these terms used in the Plan and in the evidence.

The school system formerly involved less complex procedures in the administration of the entire system by the Board. For instance, it had elementary schools involving kindergarten classes through the eighth grade; high schools from grade nine through twelve; and prior to the amended plan, there were the magnet schools which would be expanded from 25 to 32 locations serving approximately 5,000 elementary, middle and high school students, and which offered a specialized education opportunity to the children of the District as a whole and for all those who desired to attend; and where distance was concerned, bus stops were placed near their homes.

With the inauguration of the amended plan, the Board expended nearly $700,000 in the renovation of buildings. Two schools were converted to middle schools, Frick and Gladstone, and additional renovation work was under design with contracts already awarded which amounted to $700,000.

The Board expended $865,000 for inservice activities for the summer preceding the inauguration of the amended plan.

The plan provided transportation for the first time to approximately 5,000 students at an additional annual cost of $1 million.

The Board sold one school, Morse Elementary, to the Pittsburgh Housing Authority and is planning to sell Mt. Oliver School to Mt. Oliver Borough.

The Board terminated several leaseholds which had been previously rented for educational purposes, the Hahn Building or South Side OVT Center and the Corpus Christi or Lemington Annex, and fifteen demountable classrooms at five schools were sold or removed, and fifteen elementary schools were closed.

The Board reassigned forty–seven principles.

During the summer, school children and their parents participated in orientation programs in order to procure proper reactions in any difficult situations which might be encountered in their newly assigned school.

Training programs were conducted by security personnel.

All necessary equipment to implement the program was transferred to new facilities, and all furniture, equipment, etc. was moved to accommodate the children transferred to new middle schools.

A number of employees were laid off.

The plaintiffs claim that unless the preliminary injunction is issued irreparable harm will result to the parents and children who are being bused.

The defendant denies this and claims that the School District cannot return to conditions as they existed as of the time they adopted the amended plan, because facilities have been so changed that the accommodation of the children could not be made anywhere near that which had existed prior to the existence of the amended plan. Furthermore, the expenditures which would be required in an effort to re-establish the plan would be extraordinary, and in any event if a preliminary injunction were to issue, it could not possibly conform by the stopping of the amended plan at this time, because the conditions as they exist after September 2nd are in effect irreversible.

## CLASS ACTION

As for the question of class action, it is unnecessary that I make any determination that this is or is not a class action. Actually, the principles of school desegregation, as the same have been so well defined by the Supreme Court and our other Federal courts are national and apply to every parent who has children or every guardian of children in the public schools of the United States. The principles as enunciated by the Supreme Court are not provincial. They do not apply to a corner of the State of Maine and lack application to another corner of the State of Arizona.

## LACHES

The defendant asserts that the plaintiffs are guilty of laches in this case, and therefor merit no consideration for their prayer of relief at this late date, because they knew as early as June 15th of the current year that the students who had formerly attended West Liberty School were assigned to the Frick School and Milliones Middle School and of the other details in connection with the desegregation plan.

It asserts that the plaintiffs could have anticipated an "existing, actual threat" since April 18th, when the Board announced the implementation of the plan for September and that as of that time the plan became a certainty. It maintains that the application then for a preliminary injunction would have been a proper process for the purpose of "preserving the status quo". *Hollander v. American Oil Co.*, 329 F.Supp. 1300 (W.D.Pa.1971); *Skehan v. Board of Trustees of Bloomsburg State College*, 353 F.Supp. 542 (M.D.Pa.1973).

It also argues in the brief that a complaint for declaratory relief would have been an appropriate anticipatory remedy for the plaintiffs, under the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, which would not have prevented "availability of injunctive relief" as a bar once a declaratory judgment was obtained.

This court has evidence of the fact that the plaintiffs sought intervention in the Commonwealth Court action by the Human Relations Commission and this action by the plaintiffs was denied by the Commonwealth Court on July 3, 1980. Thus, it is obvious that after July 3rd, the plaintiffs were well aware of the fact that the plan had been adopted by the School Board, was being prepared and would be inaugurated as of September 2nd. Under these circumstances it would appear that the plaintiffs were guilty of laches by waiting until large expenditures of funds were made by the Board and after so many changes had been made so as to make it an impossibility of maintaining the status quo. However, even though presented as a basic defense, it is

not the one to which I am mostly directed for a solution. The matter before me is a federal question relating to the Fourteenth Amendment primarily and the congressional statutes as they may or may not relate to the subject matter; and it is that which I address here.

### THE APPLICABLE LAW

This court is bound by the principles of law laid down by the United States Supreme Court and as we apply those principles to the facts of the case. These principles have been well defined in *Brown v. Board of Education, supra.* This decision of the United States Supreme Court has been followed in *Milliken v. Bradley*, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974); *Swann v. Charlotte–Mechlenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *McDaniel v. Barresi et al.*, 402 U.S. 39, 91 S.Ct. 1287, 28 L.Ed.2d 582 (1971).

The principle concerning racial balancing authority by school boards which the Supreme Court has so specifically and lucidly set forth as an interpretation of the United States Constitution is cited in *McDaniel, supra*, at pages 41–42, 91 S.Ct. at page 1288:

"The Clark County Board of Education, as part of its affirmative duty to disestablish the dual school system, properly took into account the race of its elementary school children in drawing attendance lines. To have done otherwise would have severely hampered the board's ability to deal effectively with the task at hand. School boards that operated dual school systems are 'clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch.' *Green v. County School Board*, 391 U.S. 430, 437–438 [88 S.Ct. 1689, 1693–1694, 20 L.Ed.2d 716] (1968). In this remedial process, steps will almost invariably require that students be assigned 'differently because of their race.' See *Swann v. Charlotte–*

*Mechlenburg Board of Education*, [no. 281,] [402 U.S.] p. 1 [91 S.Ct. p. 1267, 28 L.Ed.2d 554]; *Youngblood v. Board of Public Instruction*, 430 F.2d 625, 630 (CA5 1970). Any other approach would freeze the status quo that is the very target of all desegregation processes.

Nor is the board's plan barred by Title IV of the Civil Rights Act of 1964. The sections relied upon by respondents (42 U.S.C. §§ 2000c(b), 2000c–6) are directed only at federal officials and are designed simply to foreclose any interpretation of the Act as expanding the powers of federal officials to enforce the Equal Protection Clause. *Swann, supra*, [402 U.S.] at 17 [91 S.Ct., at 1276.] Title IV clearly does not restrict state school authorities in the exercise of their discretionary powers to assign students within their school systems."

Thus it is that both contentions of the plaintiffs are legally and completely lacking in merit.

As the Supreme Court emphatically states, the whole point of desegregation is to promote indivisibility among children who are to be educated in our public schools, how then do we arrive at this determination unless we look at the racial composition of the attending students? The plaintiffs here provide neither answers nor solutions as to how this can be done otherwise.

### THE FOURTEENTH AMENDMENT

The Fourteenth Amendment to the Constitution, upon which the plaintiffs base their main reasons for the issuance of an injunction provides that,

". . . No State shall make or enforce any law which will abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

In *Youngblood v. Board of Public Instruction of Bay Co., Fla.*, 430 F.2d 625, 630, C.A. 5, 1970, this was reiterated:

"At this point, and perhaps for a long time, true nondiscrimination may be attained, paradoxically, only by taking color into consideration."

In *Offerman v. Nitkowski*, 378 F.2d 22, C.A. 2, 1967, the plaintiff's complaint was that the School Board's plan to correct *de facto* racial imbalance in the Buffalo School system was unconstitutional because it was based on proscribed racial classifications, i. e., that exceptions to the requirement that children attend neighborhood schools was based on race. The court stated:

"That there may be no constitutional duty to act to undo *de facto* segregation, however, does not mean such action is unconstitutional. . . ."

"Consideration of race is necessary to carry out the mandate in *Brown*, and has been used, as noted in cases following *Brown*. Where its use is to insure against, rather than to promote deprivation of equal educational opportunity, we cannot conceive that our courts would find that the state denied equal protection to either race by requiring its school boards to act with awareness of the problem." 378 F.2d 24, 24.

The plaintiffs depend heavily upon *University of California Regents v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). They argue that it establishes the principle that a racial quota system designed to insure minority representation in a state medical school was improper because preferential classifications could not be used in the absence of proved constitutional or statutory violations. 438 U.S. at 302, 98 S.Ct. at 2755.

However, the Supreme Court's continuous line of public school desegregation cases is completely opposite. Unlike the situation in *Bakke, supra*, where a student could be precluded from obtaining a medical school education by operation of the quota, no student in the instant case is excluded from the benefits of a free public education through the Amended Pittsburgh Desegregation Plan. This Plan merely determines which middle school a student will attend, so as to correct racial imbalance.

Whether there has been a statutory violation is actually a matter presently before the State courts and the state agency. A portion of Article XIV requires that all states, and their political sub–divisions, must grant equal protection of laws to all persons and that the law be applied equally amongst all persons. Thus, the Supreme Court decision is that if there is a prejudicial discriminatory difference in the handling of school children of one race from the handling of school children of another race, there is a denial of that equal protection which the Fourteenth Amendment grants.

## CIVIL RIGHTS

The plaintiffs in support of their contention that no racial busing is permitted under the Civil Rights Act, 42 U.S.C. § 2000c–6 cite the proviso,

". . . that nothing herein shall empower any official or court of the United States to issue any order seeking to achieve a racial balance in any school by requiring the transportation of pupils or students from one school to another or one school district to another in order to achieve such racial balance, or otherwise enlarge the existing power of the court to insure compliance with constitutional standards."

The plaintiffs, however, are mis–informed as to the application of this proviso clause, since it is an authority by Congress for the Attorney General in civil actions to perform services when complaints are made in a particular manner as designated in the said section. The proviso, therefore, pertains only to the federal official, primarily the Attorney General or his staff. This has been interpreted in *McDaniel v. Barresi et al.*, 402 U.S. 39, 91 S.Ct. 1287, 28 L.Ed.2d 582 (1971). The plaintiffs, therefore, have no remedy under this provision.

In the Legislative History, Senator Cooper in the Senate debates as a supporter of the Civil Rights Act of 1964, stated with regard to the school desegregation portion of the Act:

"First of all, in section 401, page 13, beginning at line 23, we find the following definition:

(b) 'Desegregation' means the assignment of students to public schools and within such schools without regard to their race, color, religion or national origin, but 'desegregation' shall not mean the assignment of students to public schools to overcome racial imbalance. So, 'desegregation' is definitely defined; and the term 'desegregation', as defined in section 401, is used with the same meaning throughout the bill. It is clear that desegregation could not be used to achieve what is called 'racial balance'; that problem is one for the States, and by local school board authorities." [6]

In explaining that this portion of the Act merely follows the Supreme Court's decision in *Brown, supra,* Mr. Cooper stated:

"I do not believe the decision meets a problem which has been recognized since that time. That problem is what is called de facto segregation. In my judgment, problems of de facto segregation were not considered in the Brown case. Such problems are for the States and local districts to decide." [7]

The late Senator Hubert Humphrey, a co–sponsor of the Act further elaborated this point:

"In other words, an overt act by law which demands segregation is unconstitutional. That was the ruling of the historic *Brown* case of 1954. If the school district boundaries are determined without any consideration of race or color, there is no affirmative duty under the Constitution to alter these boundaries so that a particular racial balance in the schools will result. Senators should distinguish between segregation which results from an overt or affirmative act by the State or the local school board and de facto segregation which results from neighborhood residence patterns. This is a matter better left to the courts and to the localities to resolve as each community deems wisest. It is not a consideration of the present bill." [8]

## AMICI CURIAE

Two briefs have been filed, each amicus curiae. In the first the Pennsylvania Human Relations Commission presented its brief without seeking to be made a party to the action. I allowed the two parties' counsel and the Commission counsel to argue the matter before me and present any supplemental briefs which they might have wished to do.

At the supplemental hearing, I inquired of counsel for the Commission on the change of direction which the Commission was taking before me as against its attack before the State courts. In the State courts the Commission attempted to stop the Board by injunctive proceedings from inaugurating its plan because it did not go far enough. It failed in its injunction proceedings but the matter still continues in the State courts. In the hearing before me, the Commission's counsel indicated that it was better to have a part of the plan inaugurated than none at all.

In examining the brief of the Commission, I find mostly argument on the necessary elements for injunctive relief. Since it is obvious, and I so find, that the plaintiffs have not indicated irreparable harm either to the Association or the parents or their children, but have indicated much more harm to the School District and system and to the public as a whole and the children who attend the school system. On this basis alone, a preliminary injunction could not prevail under any circumstances. I need not discuss any particular incidents in regard to a preliminary injunction.

As for the children being bused, it seemed that the evidence showed that the children had no complaints to make, but in a sense, I concluded, it was for them more an adventure to their liking than an inconvenience to their parents.

6. Congressional Record, 88th Congress, 2nd Session, page 6841.

7. Ibid.

8. Ibid, at page 13821.

The second amicus was an individual who claimed to have been a former director of the Board and claimed much else concerning the methods of the Board and the bad business which the Board had been and was exhibiting. He claimed further that the Board was destroying the system rather than making it better than the whole system of education. He argued that education should have been the Board's primary concern; that athletics, recreation centers and sports fields were not a necessary part of an educational system; and that expenditures of large amounts of money were being wasted by the abandonment of fifteen schools in the plan presently being inaugurated by the Board.

I discern a great deal of antipathy in the attitude of the argument in the seventeen handwritten pages of the petition, but such matters which he raises are not before me. They are actually before the Board and the Commission, as well as before the Courts of the Commonwealth of Pennsylvania. For me to say that I sympathize with him and the parents who are opposed to busing, because they are greatly inconvenienced thereby and the hazards they assert are present, and because too much time is lost by the children being bused, may be helpful to the feelings of the parents, but as a federal judge I must be concerned only with the purely federal questions of whether or not legal integration is being done in accordance with the principles laid down in the federal court system.

I may disagree with the Board and with the Commission in both of their attitudes so far as they relate to permitting schools of a total race to exist in the City of Pittsburgh, because as long as these do exist, the federal principle of fully unitizing schools is not being fulfilled. I may even have hoped that an easier, more comfortable and convenient and less expensive method might be arrived at than any busing system, let alone that of the Pittsburgh Board's plan, but such matters must be left to the State authorities to exercise their best discretion.

Since the matter is now before the State authorities, it is essential for this court to give due faith and credit to the actions of the Board, the Commission and the State courts in the belief that eventually the unitized school system will become effective in accordance with federal law and in accordance with the Human Relations Act. Until it can be shown to a federal court that the Board is acting contrary to the unitizing principle laid down by the Supreme Court and of the law of the Commonwealth of Pennsylvania, or that it is done with bad intentions, this court can only determine whether the responsibility is being placed legally on the shoulders of the State authorities and agencies.

■ The operation of a non-discrimination system is the responsibility of the State and not the federal court system. *Evans v. Buchanan*, 582 F.2d 750, C.A.3, 1978. Thus, because the Board has commenced what it is hoped will eventually turn out into a complete unitary system under the law, it is vested with the board discretion in pupil assignments. *Darville v. Dade County School Board*, 497 F.2d 1002, C.A.5, 1974.

## CONCLUSION

■ The plaintiffs here have shown, first, no violation of law in the selection of children for busing; second, no prejudice resulting to the children, either physically or psychologically; and third, no better or more reliable substitution or plan for the integration of the public schools which I have found to be not yet desegregated because of the complexity of the City and of the number of ethnic groups as populated in the City. Primarily, in accordance with the strict issue which the complaint has set forth as the cause of action here based on mixed or balancing racial busing, I find the plaintiffs are not entitled to any remedy on the action before me and deny their prayer for a preliminary injunction.

Unless the parties stipulate on this as a finality, further pretrial proceedings will be directed in accordance with law.

The Findings of Fact and Conclusions of Law are incorporated and made a part of

this Opinion in accordance with Federal Rule of Civil Procedure 52.[9]

---

**9.** Rule 52 Findings by the Court.

(a) ". . . If an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact and conclusions of law appear therein."